UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard MOHAWK, Defendant–Appellant.

No. 83–5207.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1992.

Submission Withdrawn July 2, 1992.

Resubmitted Dec. 3, 1992.

Submission Vacated April 2, 1993.

Resubmitted Dec. 1, 1993.

Decided April 13, 1994.

Phillip A. Trevino, Los Angeles, CA, for defendant-appellant.

Kendra S. McNally, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: ALARCON, NORRIS, and O'SCANNLAIN, Circuit Judges.

Opinion by Judge O'SCANNLAIN.

O'SCANNLAIN, Circuit Judge:

In 1983, Richard Mohawk was convicted of armed bank robbery and sentenced to a term of twenty years in prison. He filed a timely notice of appeal from his conviction. Today, after more than ten years, we decide that appeal in his favor. In the end, we are called upon to determine whether, because of this extraordinary delay, it would violate due process to permit the government to subject Mohawk to a second trial.

I

On January 28, 1983, three people robbed a Security Pacific National Bank in Los Angeles, California.[1] The government sought to prove that appellant Mohawk was among them. One of the robbers wore a hooded jacket and carried a sawed-off shotgun, which was fired during the course of the robbery, wounding a customer. Before the grand jury, the officer who arrested Mohawk testified that, at the time of the arrest, Mohawk was wearing a hooded jacket like the one identified by witnesses to the robbery.

---

1. Because the bank was a federally insured institution, the district court had jurisdiction under 18 U.S.C. § 3231. The source of our jurisdiction is 28 U.S.C. § 1291.

Mohawk, however, insisted that the officer's testimony was false.

It appears that Mohawk's appointed counsel greeted this avowal with great skepticism. First one attorney and then a second were designated to represent Mohawk, but neither apparently believed that the government would fabricate evidence against him in so blatant a fashion. So, too, neither would embrace the litigation strategy Mohawk wished to adopt, namely, that he had been falsely accused because of his activities on behalf of Native Americans. The record suggests that, because of these conflicts, Mohawk determined to represent himself at trial.

At Mohawk's request, his first attorney asked to be relieved. The district court granted counsel's motion, but, over Mohawk's objection, appointed a new attorney to represent him. When the second attorney-client relationship snagged upon the same points of disagreement that had scuttled the first, Mohawk renewed his request to be permitted to represent himself at trial. After a hearing on June 21, 1983, the district court granted this request, although the attorney remained in court through the trial as advisory counsel.[2]

Mohawk's trial for armed bank robbery began on June 22, 1983. The jury received its instructions and began deliberations on July 1, 1983, returning a verdict of guilty later that same day. Mohawk received his sentence and then filed a timely notice of appeal on August 9, 1983. Two weeks later he filed a timely transcript designation requesting that all trial transcripts be included as part of the record on appeal.

To this day that request remains unfulfilled in significant part. Whether through unwillingness or inability to do so, and despite repeated orders from this court, the various court reporters with responsibility for compiling a record of the proceedings at Mohawk's trial failed to produce the required transcripts. Even after the imposition of sanctions, the reporters would not or could not produce all the transcripts demanded. In particular, the record before us now does not contain a transcript covering the critical proceedings on June 21, 1983, when the trial court granted Mohawk permission to proceed in propria persona.

Four years were consumed in this fruitless effort to secure the complete trial record. Ultimately, in September 1987, this court ordered the parties to submit a settled statement of the proceedings covered by the missing transcripts pursuant to Rule 10(c) of the Federal Rules of Appellate Procedure.[3]

---

**2.** As he had done before the grand jury, the officer who arrested Mohawk testified at trial that Mohawk was wearing the incriminating jacket at the time of his arrest. After his initial cross-examination by Mohawk, the officer did some further research on the point during the evening recess. Upon resuming the stand the next day, he corrected his testimony and reported that it was not Mohawk, but rather one of his separately tried co-defendants who had been arrested while wearing the jacket. While this fact may help to explain why Mohawk elected to proceed in propria persona, it was not of critical significance at trial. On appeal, Mohawk does not argue that there was insufficient evidence of his involvement in the robbery to support his conviction.

Mohawk does contend that the arresting officer's erroneous grand jury testimony means his indictment was improperly obtained, but we see no merit in such a contention. Nothing in the record before us suggests that the officer knowingly gave or the prosecution knowingly used false testimony before the grand jury. Moreover, there was substantial additional evidence—including numerous identifications of Mohawk as

the man with the sawed-off shotgun in the bank surveillance photos—to establish the requisite probable cause to support the indictment. We conclude that the erroneous testimony "was not sufficiently material to justify holding that it substantially influenced the grand jury's decision to indict." *United States v. Spillone*, 879 F.2d 514, 524 (9th Cir.1989), *cert. denied*, 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990). Accordingly, we refuse to dismiss Mohawk's indictment on this ground.

**3.** "If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal." Fed.R.App.P. 10(c).

The parties' attempts to comply with this order occupied the next two years. Following submission, another year passed before the certificate of record issued from the district court. At that point, Mohawk moved for the appointment of appellate counsel, which motion was granted. Mohawk's opening appeal brief was filed fifteen months later, on January 27, 1992.

Oral argument was heard and the case submitted on May 8, 1992. The release of the Supreme Court's decision in *Doggett v. United States* on June 24, 1992, forced us to withdraw the case from submission and to order supplemental briefing. The case was resubmitted and an opinion prepared, but we were prevented from releasing it by this court's determination that the case of *United States v. Tucker*, 964 F.2d 952 (9th Cir.1992), should be reheard en banc. *See United States v. Tucker*, 8 F.3d 673 (9th Cir.1993) (en banc). The en banc decision in *Tucker* permits us finally to decide this appeal—more than ten years after its timely filing. We now reverse Mohawk's conviction and remand to the district court for further proceedings.

## II

The Sixth Amendment confers upon a criminal defendant the right to represent himself or herself at trial. *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562 (1975). However, the decision to proceed pro se entails the waiver of the right to counsel provided by the same amendment. Any such decision is invalid unless knowingly and intelligently made. *Godinez v. Moran*, —— U.S. ——, ——, 113 S.Ct. 2680, 2687, 125 L.Ed.2d 321 (1993); *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2531. On appeal, Mohawk contends that his decision to waive the assistance of counsel did not meet this standard.

For a defendant's decision to represent himself or herself to be knowing and intelligent, it must be established that the defendant was "aware of the nature of the charges against him, the possible penalties, and the dangers and disadvantages of self-representation." *United States v. Balough*, 820 F.2d 1485, 1487 (9th Cir.1987) (citation omitted). In particular, we require proof that the defendant understood his or her "constitutional right to have [a] lawyer perform certain core functions," and that he or she "appreciate[d] the possible consequences of mishandling these core functions and the lawyer's superior ability to handle them." *United States v. Kimmel*, 672 F.2d 720, 721 (9th Cir.1982). In conducting this inquiry, our focus is on what Mohawk understood at the time of his decision. *See Balough*, 820 F.2d at 1489.

It is the government that bears the burden of showing that a defendant's waiver of trial counsel was knowing and intelligent. *See Michigan v. Harvey*, 494 U.S. 344, 353–55, 110 S.Ct. 1176, 1182, 108 L.Ed.2d 293 (1990); *United States v. Ant*, 882 F.2d 1389, 1394 (9th Cir.1989). That burden is a heavy one in general, and heavier still under the circumstances of this case. We have said that "[t]he preferred procedure to ensure that a waiver is knowingly and intelligently made is for the district court to discuss [the decision] with the defendant in open court." *Balough*, 820 F.2d at 1488; *Hendricks v. Zenon*, 993 F.2d 664, 670 (9th Cir.1993). Ordinarily, we simply would review the answers given by a defendant in his or her colloquy with the court to evaluate whether the decision to waive counsel was knowing and intelligent. Here, we are prevented from doing so, for there is no contemporaneous record of the June 21, 1983 proceedings at which Mohawk received permission to proceed in propria persona. We thus cannot be certain how the court advised Mohawk with respect to the potential consequences of representing himself, nor what sort of appreciation of those consequences Mohawk displayed. The Rule 10(c) settled statement is of no help in this regard, for it fails to reconstruct any of the pertinent events that may have transpired at the June 21 hearing.

For purposes of analysis, then, we must assume that the district court wholly failed to discuss the question of waiver with Mohawk. As a rule, such a failure is conclusive and requires automatic reversal of a defendant's conviction. *See id.* A "limited exception" to this rule permits us to conclude

that a waiver is knowing and intelligent from "the particular facts and circumstances surrounding [the] case, including the background, experience and conduct of the accused." *Id.* (quoting *Kimmel,* 672 F.2d at 722). That exception, however, is unavailing on this record. Nothing before us suggests that Mohawk was possessed of "any legal training, specialized education, or unusual background" that might allow us to say that he truly understood the implications of his decision to represent himself. *Id.* at 1488–89. That Mohawk handled his defense more or less capably—he clearly did, for example, conduct an effective cross-examination of his arresting officer, forcing him to change his testimony—is, under our precedents, irrelevant. "The manner in which a defendant conducts his defense cannot establish his state of mind at the time he opted for self-representation." *United States v. Aponte,* 591 F.2d 1247, 1250 (9th Cir.1978), *quoted in Balough,* 820 F.2d at 1489. Similarly, that Mohawk emphatically asserted his desire to represent himself does not mean that this desire was founded on a true appreciation of the dangers of proceeding without counsel. On the contrary, the record suggests the possibility that Mohawk was preoccupied with his court-appointed attorneys' unwillingness to believe his account of the facts and to adopt his preferred trial strategy, and thus that his decision to dispense with their assistance might have been made with insufficient regard for its implications.

We think Mohawk's decision to waive his right to counsel may well have been knowing and intelligent—but we are not free from doubt. The government has relied upon the record before us and admits that it cannot hope to produce a better one. Thus, remand would be pointless. We therefore hold that the government has failed to carry its burden of establishing knowing and intelligent waiver, and that Mohawk's Sixth Amendment rights under *Faretta* have been violated.[4] Accordingly, we reverse his conviction.

---

4. Harmless error analysis is inapplicable to the unconstitutional denial of the right to counsel. *See Balough,* 820 F.2d at 1490 (relying on *Rose v.*

## III

Mohawk argues that his indictment should be dismissed because of the amount of time it has taken for his appeal to be heard.

"[E]xtreme delay in the processing of an appeal may amount to a violation of due process." *United States v. Antoine,* 906 F.2d 1379, 1382 (9th Cir.), *cert. denied,* 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 407 (1990). However, "not every delay in the appeal of a case, even an inordinate one," implicates an appellant's due process rights. *Id.* at 1382 (quoting *Rheuark v. Shaw,* 628 F.2d 297, 303 (5th Cir.1980), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981)). Four factors must be considered in evaluating claims of appellate delay: "(1) the length of the delay; (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant." *Tucker,* 8 F.3d at 676. "The fourth inquiry is the most important: a due process violation cannot be established absent a showing of prejudice to the appellant." *Id.* (internal quotations omitted).

The government concedes, and we agree, that the first three of these four factors weigh in Mohawk's favor on the facts of this case. First, a delay of ten years is "extreme" by any reckoning. *See Coe v. Thurman,* 922 F.2d 528, 531 (9th Cir.1991) (characterizing eight-and-a-half year delay as "staggering"). Second, the delay was occasioned by the fault of the court reporters. Thus, notwithstanding that a different branch than that which brought the prosecution caused the delay, it remains attributable to the government. *See id.* ("delays by the court are attributable to the state"). Third, Mohawk undeniably has done his best to press forward with his appeal.

The critical question, then, is whether Mohawk is able to establish that he was prejudiced by the inordinate length of the appellate process. Three types of prejudice can flow from appellate delay: (1) oppressive incarceration pending appeal; (2) anxiety and concern of the convicted party awaiting the

*Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–06, 92 L.Ed.2d 460 (1986)).

outcome of the appeal; and (3) impairment of the convicted person's grounds for appeal or of the viability of his defense in case of retrial. *Tucker*, 8 F.3d at 676. "It is emphasized that the last [of these three] is the most significant." *Coe*, 922 F.2d at 532; *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972).

Turning first to the second factor, anxiety and concern, an appellant can establish prejudice only if he or she reasonably experiences anxiety and concern "to such a degree as [to] distinguish his [or her] case from that of any other prisoner awaiting the outcome of an appeal." *Tucker*, 8 F.3d at 676 (internal quotations omitted). Mohawk has not demonstrated that he experienced anxiety and concern greater than any other prisoner appealing his or her conviction. He thus cannot establish prejudice under this factor. *Id.*

We look next to the first factor, oppressive incarceration. It is quite clear that "[i]f [an appellant's] conviction was proper, there has been no oppressive confinement; he has merely been serving his sentence as mandated by law." *Antoine*, 906 F.2d at 1382; *see Tucker*, 8 F.3d at 676. Conversely, it can be said that "incarceration [is] unjustified and thus oppressive" where a defendant's conviction is reversed on the merits on appeal. *Coe*, 922 F.2d at 532. However, for the same reason that an appellant can establish prejudice only by demonstrating that he or she experiences greater anxiety and concern than other persons awaiting their appeals, an appellant must distinguish himself or herself from any other prisoner victorious on appeal in order to demonstrate that the extension of his or her incarceration through delay was so oppressive as to warrant the setting aside of an indictment. If it were otherwise, then prejudice would exist in every case of appellate

delay where a prisoner is awarded a new trial. We do not believe that we are authorized to dismiss an indictment under such broad circumstances. *Tucker*, 8 F.3d at 674 ("Although we have supervisory power, the circumstances under which we may exercise that power are substantially limited."); *see also, Antoine*, 906 F.2d at 1383 (appellant "may" have suffered oppressive confinement if appeal from conviction is "substantively meritorious").

Since we have concluded that Mohawk's conviction must be reversed because of the *Faretta* violation, we conclude that he has been "oppressively incarcerated." Mohawk has not demonstrated, however, that his incarceration is any more "oppressive" than that of any other prisoner who has succeeded on appeal. Consequently, while reversal of Mohawk's conviction indicates that he has suffered some prejudice, this fact alone is not determinative of this issue.

These considerations lead us to the final category of prejudice, impairment of the appellant's legal position. Mohawk does not suggest that the delay in processing this appeal has in any way undermined his substantive arguments for reversal before this court. He does, however, allege that he would be prejudiced in the event of a retrial. He offers two reasons: (1) defense witnesses will not be locatable after so many years, and (2) the bases on which the testimony of key government witnesses was impeached in the original trial may no longer have the same impact.[5]

Neither of these allegations suffices to show prejudice. As for the first, Mohawk has not identified any witness he would wish to call on retrial who would be unavailable to testify. His mere speculation on this point carries no weight. As for the second, we doubt that a change in a defendant's ability

---

5. One of the more important witnesses against Mohawk was one Verdell Thundershields. Thundershields was convicted in a separate trial of participating in the same bank robbery for which Mohawk was tried. He subsequently agreed to testify at Mohawk's trial, and identified Mohawk as one of the other robbers. On cross-examination by Mohawk, Thundershields was significantly impeached with evidence of prevalent drug use, mental instability, and his incentive to testify in exchange for benefits promised by the government with respect to his own sentencing. Mohawk argues that he would be prejudiced if Thundershields were to testify in a second trial exactly as he did at the first, because he might no longer be a drug user, mentally unstable, or beholden to the government.

to impeach an unfavorable witness, attributable to the inevitable change over time in the circumstances under which that witness testifies, implicates the rights protected by the Due Process Clause. In this instance, at least, Mohawk's speculation about his ability to impeach the witnesses that might appear against him is unpersuasive.

Mohawk thus has not made an affirmative showing of particularized trial prejudice from the long period of appellate delay he has had to endure. This, however, does not necessarily end our inquiry. The Supreme Court's decision in *Doggett v. United States,* —— U.S. ——, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), compels our attention, and raises the question whether we should presume that the delay has prejudiced Mohawk's ability to defend himself on retrial.

Doggett was indicted on federal drug charges in February 1980. Before he could be arrested, however, he left the country and the government lost track of his whereabouts. As a result of negligence on the part of the government in pursuing Doggett, he was not arrested until September 1988, eight and a half years after his indictment. Doggett claimed that this inordinate pre-trial delay violated his rights under the Speedy Trial Clause. Applying a test for pre-trial delay equivalent to that applicable to appeals, the Court found that Doggett had satisfied the requirements of the first three factors. He was, however, unable to demonstrate that he had been prejudiced in any way by the lag between indictment and trial. Doggett could hardly claim oppressive incarceration or undue anxiety and concern, since he was at large during the entire period of the delay and apparently knew nothing of his indictment until the time of his arrest. More importantly, Doggett "failed to make any affirmative showing that the delay weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence." —— U.S. at ——, 112 S.Ct. at 2692. The Court however, did not deem this failure fatal to Doggett's cause:

> [A]ffirmative proof of particularized prejudice is not essential to every speedy trial claim. *Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." 407 U.S. at 532, 92 S. Ct. at 2193. And though time can tilt the case against either side, one cannot generally be sure which of them it has prejudiced more severely. Thus, *we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.* While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of delay.

*Id.* —— U.S. at —— —— 112 S.Ct. at 2692–93 (underscore added, citations omitted).

The question thus arises whether the logic of the Supreme Court's decision in *Doggett* applies with equal force to the case at hand. We must decide whether Mohawk is entitled to benefit from a presumption that delay on appeal has impaired the viability of his defense on retrial, just as Doggett was presumed to have been prejudiced in his ability to defend himself at a first trial because of the lag between indictment and prosecution.

If this were an ordinary case, we would answer this question in the negative without hesitation. The plain fact is that it is not "generally" the case that delay compromises the reliability of a *retrial*, as it does the reliability of a *first trial* on the merits. To appreciate why this is so, we need only reflect upon what it is about delay that gives rise to concern. Two sorts of prejudice to a defendant are feared from extreme delay. First, there is the possibility that witnesses will "die or disappear," or that their memories will fade, leaving them "unable to recall accurately events of the distant past." *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193. Second, there is the problem of "time's erosion of exculpatory evidence," *Doggett,* —— U.S. at —— —— ——, 112 S.Ct. at 2692–93, the risk

that a defendant will be deprived of a fair opportunity of pursuing facts that will be useful in his defense before the trail is cold.

It is evident that, in the pre-trial delay context, it is quite impossible to judge how significant these sorts of concerns may be, hence there is no way to evaluate their likely impact on an accused's defense. A presumption of prejudicial impact thus makes sense in such context. The same cannot be said, however, in a situation involving appellate delay. The criminal defendant who prevails in a delayed appeal will ordinarily have been convicted (albeit under circumstances requiring reversal) in a full-fledged adversary proceeding of which there is a complete and reliable record. Such an appellant, in facing the prospect of retrial, thus has at his disposal the means of combatting or at least of identifying any prejudice to his defense that might otherwise arise from the passage of time. If important witnesses have become, for one reason or another, unavailable, their former testimony may be introduced at the second trial. *See* Fed.R.Evid. 804(b)(1). If memories have faded, they can be refreshed, using the record compiled in the first trial. *See* Fed.R.Evid. 612. If key testimony unaccountably changes, it can be impeached by the same means. *See* Fed.R.Evid. 613. *See generally United States v. Chavez,* 979 F.2d 1350, 1355 (9th Cir.1992) (explaining how availability of trial transcripts obviates problem of impairment of defense on retrial). As for the opportunity to collect exculpatory evidence, a defendant is in no sense deprived of this by a delay before retrial, so long as he was able to pursue this opportunity in connection with his original trial. *See id.*

In short, we are not persuaded that extreme appellate delay generally threatens to prejudice a defendant's ability to defend himself on retrial "in ways that [he] can[not] prove or, for that matter, identify." *Doggett,* —— U.S. at ——, 112 S.Ct. at 2693. In this

respect, we deem *Doggett* inapposite, and therefore conclude that it would be inappropriate to afford all appellate delay claimants the benefit of an automatic presumption of prejudice. Rather, we think the rules established in our prior cases remain valid, and that the appellant must ordinarily be required to show actual trial prejudice in the event of a second prosecution in order to win outright dismissal of his indictment on the grounds of appellate delay.

We acknowledge that, given our decision that Mohawk's Sixth Amendment rights were violated, his situation is unusual. Mohawk was represented by counsel up until the day his trial began, indicating that he had a full opportunity to pursue exculpatory evidence when it mattered most. He also had the assistance of advisory counsel throughout his trial and availed himself of that assistance. Finally, although the absence of one particular transcript has required us to hold that Mohawk's waiver of the right to counsel was invalid, the transcripts of the *testimony* offered at trial appear to be complete and reliable.[6] These transcripts suggest that Mohawk was an effective advocate in his own behalf and contain no glaring omission demonstrating that the record is undeveloped in some critical fashion.

Nevertheless, as the court of appeals, we recognize that we are not in the best position to assess the effect of Mohawk's lack of representation at trial on his ability to demonstrate actual prejudice in the event of retrial. We thus remand that question to the district court for determination.

## IV

We conclude by emphasizing that nothing in this opinion should be taken either to condone or to extenuate the appalling treatment that Mohawk has suffered at the hands of the court system. This case has required us to locate the proper balance between indi-

---

6. Apart from the hearing at which the district court approved Mohawk's request to proceed in propria persona, transcripts appear to be lacking only for the proceedings held at the conclusion of the trial (involving jury instructions, closing arguments, etc.), and certain proceedings held outside the presence of the jury at the end of two of the trial days. The importance of these sorts of lacunae on direct appeal is clear. But it is hard to imagine how these portions of the first trial could become of importance at a second trial.

vidual and societal interests in a situation involving the incarceration of a man convicted of a violent crime, and we have not found that balance an easy one to strike. Nonetheless, we do not suggest that it is anything less than unconscionable that a criminal appeal should take ten years to process. We accept our share of the responsibility here, for the delay Mohawk has endured was undeniably attributable, at least in part, to our own court's failure to supervise the actions of a dilatory court reporter. In the future, this court will undoubtedly be quick to respond to allegations that an appeal has been unjustifiably delayed, and will be prepared to deal firmly with those individuals who prove responsible for that delay.

The judgment of conviction is REVERSED and the case REMANDED to the district court for further proceedings.