Willie LATIMORE, Petitioner

v.

Luis SPENCER, et al., Respondents.

No. CIV.A. 97–11563–EFH.

United States District Court, D. Massachusetts.

Feb. 6, 1998.

Robert Carnes, Pittsfield, MA for Willie R. Latimore, Petitioner.

Gregory I. Massing, Attorney General's Office, Boston, MA for Luis Spencer, Superintendent, L. Scott Harshbarger, Attorney General, Respondents.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

Petitioner, Willie Latimore, petitions this court for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 alleging that his conviction in the Massachusetts Superior Court for second degree murder was unconstitutionally obtained in violation of his Four-teenth Amendment rights to equal protection and due process of law and of his Sixth Amendment right to a speedy trial. First, he contends that the prosecution impermissibly exercised peremptory challenges on the basis of race during jury selection. Second, he alleges that the judge's instruction on reasonable doubt constituted a reversible error. Third, he argues that the government's rejection of his proposed *Alford* plea to a manslaughter charge was an abuse of prosecutorial discretion. Last, he claims that the seventeen-year delay between his first trial and second trial violated his Sixth Amendment right to a speedy trial and his post-conviction right to due process.

## I. BACKGROUND

### A. Facts

The Court states the factual background in the light most favorable to the verdict. *Stewart v. Coalter*, 48 F.3d 610, 611 (1st Cir.), *cert. denied*, 516 U.S. 853, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995). The facts of the case are summarized in *Commonwealth v. Latimore*, 423 Mass. 129, 667 N.E.2d 818 (1996). Briefly stated, on the evening of October 18, 1975 at a tavern in Taunton called the Canadian Club, Philip Poirier was stabbed in the chest and died shortly thereafter. Earlier in the evening petitioner was at the club with his brother and a female companion. They became noisy while playing pool, and Poirier asked them to quiet down. Petitioner told Poirier, "Keep your mouth shut, you're not behind the bar." Petitioner and his party left the bar a short time later.

Petitioner and his companions drove to a package store, then to petitioner's brother's house and then back to the club. Petitioner reentered the club while his companions waited in the car. Poirier said something to petitioner, to which petitioner responded "When are you going to learn to keep your mouth shut?" Blows were exchanged and the two men grappled on the floor. The fight ended when Poirier, having pinned petitioner to the ground, helped him to his feet and said, "Well, I got the worst of it.... Look, my shirt's all torn." Moments later Poirier said, "Oh, you son of a bitch." He staggered, fell to the floor, and died from a

single stab wound to the chest. Petitioner ran to the car and drove away from the scene. The four eyewitness to the stabbing stated that they neither saw the knife nor the actual stabbing. No knife was ever found.

Petitioner's description of the events differed from the Commonwealth's version. Petitioner testified at trial that he had returned to the club to search for his wallet, which he discovered was missing while at the package store. Petitioner said that Poirier pulled out the knife and while wrestling he rolled Poirier over, causing Poirier to be stabbed by the knife.

### B. *Prior Proceedings*

On October 29, 1975, a Bristol County grand jury indicted petitioner for the murder of Philip Poirier. On May 24, 1976, the jury convicted petitioner of murder in the first degree, and the court sentenced him to a life sentence. The Massachusetts Supreme Judicial Court affirmed the conviction on August 7, 1979. *Commonwealth v. Latimore*, 378 Mass. 671, 393 N.E.2d 370 (1979).

On May 6, 1982, petitioner filed a motion for a new trial in the Superior Court. The court denied the motion on January 18, 1983. Pursuant to Massachusetts General Laws ch. 278, 33E, petitioner sought leave from a single justice of the Supreme Judicial Court to appeal the denial of his new trial motion. Justice Nolan denied leave to appeal on November 22, 1983, and denied petitioner's motion for reconsideration, filed on March 19, 1984, on April 11, 1984.

On October 23, 1989, petitioner filed a petition in federal district court for a Writ of Habeas Corpus. On February 1, 1990, the respondent moved to stay the habeas corpus action pending the Commonwealth's seeking clarification of Justice Nolan's prior denial of the petition for leave to appeal. On February 21, 1990, Justice Nolan entered an amended order, *nunc pro tunc* to November 23, 1983, stating, "The application for leave to appeal is denied for reasons of procedural default." Petitioner's habeas corpus petition was accordingly withdrawn.

On June 28, 1991, petitioner filed a second motion for a new trial. The Superior Court on August 13, 1992, allowed the motion and ordered a new trial on the ground of the trial court's instruction on "malice." The Commonwealth's application for leave to appeal was denied by a single justice of the Supreme Judicial Court on November 18, 1992. Petitioner was released on bail and filed several motions for continuances. Retrial commenced on October 12, 1993. On October 19, 1993, a jury convicted petitioner of second-degree murder and the court sentenced him to a term of life imprisonment.

Petitioner appealed, and on July 11, 1996, the Supreme Judicial Court affirmed his conviction. *Commonwealth v. Latimore*, 423 Mass. 129, 667 N.E.2d 818 (1996). The instant Petition for a Writ of Habeas Corpus was filed on July 10, 1997.

## II. *DISCUSSION*

### A. *Peremptory Challenges*

■ Latimore, who is black, asserts that in his second trial the government violated his right to equal protection of the law by exercising race-based peremptory challenges in selecting the jury that convicted him. In evaluating an equal protection challenge to a prosecutor's use of a peremptory strike, a three-part framework should be employed. *Batson v. Kentucky*, 476 U.S. 79, 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *United States v. Bergodere*, 40 F.3d 512 (1st Cir. 1994), *cert. denied*, 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995). First, the defendant must make a prima facie showing of discrimination in the prosecutor's launching of the challenge. *Batson*, 476 U.S. at 96–97. At the second stage, once a prima facie case has been made out, the burden shifts to the prosecutor to articulate a race-neutral explanation for the challenge. *United States v. Perez*, 35 F.3d 632, 634 (1st Cir.1994). The prosecutor's burden is merely a burden of production, not a burden of persuasion. *Bergodere*, 40 F.3d at 515. Finally, if the prosecutor articulates a race-neutral reason, the trial court is charged with deciding whether the defendant has carried his burden of proving that the challenge constituted purposeful discrimination on the basis of race. *Hernandez v. New York*, 500 U.S. 352,

358–359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

At trial defense counsel objected that there was a pattern of discriminatory intent in the Commonwealth's use of peremptory challenges to remove all nonwhite jurors from the venire. The prosecutor used two of his six peremptory challenges to remove two nonwhite members of the venire. He also used a third peremptory challenge to remove another member of the venire who stated in voir dire that she had "mixed race" in her family. The final jury composition had no non-white jurors.

■ The First Circuit has made clear that the question of whether a defendant has established a *Batson* prima facie case is a mixed question of law and fact that is fact sensitive and, therefore, should be reviewed under the clear-error standard. *Bergodere,* 40 F.3d at 516. Here, there was no explicit factual findings made by the trial judge on petitioner's prima facie *Batson* challenge. This Court concludes that the trial judge implicitly found that petitioner had established a prima facie case when the judge asked the government to give reasons for its peremptory challenges. *Hernandez,* 500 U.S. at 359 ("Once a prosecutor has offered a race-neutral explanation and the trial judge has ruled on the ultimate question of racial discrimination, the preliminary issue of whether the defendant made a prima facie showing is moot.")

■ The next step of the inquiry is whether the prosecutor met his burden of articulating a race-neutral basis for striking the jurors. *Perez,* 35 F.3d at 634. The second step of this process does not demand an explanation that is persuasive, or even plausible. *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). "At the [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Hernandez,* 500 U.S. at 360. Thus, an explanation is race neutral simply if it is based on something other than the race of the juror. *Id.* at 360.

■ In the present case the prosecutor offered a race-neutral explanation for each of the three peremptory challenges at issue. The prosecutor's reasons for the peremptory challenges are detailed in footnote 8 of the Supreme Judicial Court's decision. *Latimore,* 423 Mass. at 137–138 n. 8, 667 N.E.2d 818. The prosecutor struck Juror 1–3 due to her young age and the fact that she appeared tentative while answering questions during voir dire. The prosecutor struck Juror 1–15 because she had a ninth grade education, no outside occupation in her adult years, and appeared "a little bit odd." Additionally, the prosecutor noted that she had been involved in a domestic relations injunction case which may have affected her view of the District Attorney's Office. The prosecutor struck Juror 5–2 because he was a full time student and that students tend to be more liberal. Additionally, the prosecutor stated that the juror was wearing a sweatshirt which tends to show a level of disrespect for the serious public obligation of jury duty.

■ Although attorneys cannot be permitted to exercise peremptory challenges based on race, they are not prohibited from striking from the venire the persons of a particular race for a race neutral reason. *Bergodere,* 40 F.3d at 517. The fact that the exercise of peremptory challenges produced a final jury with no nonwhite jurors does not negate the prosecutor's race neutral explanations at this stage. *Hernandez,* 500 U.S. at 362. ("[D]isparate impact... will not be conclusive in the preliminary race-neutrality step of the *Batson* inquiry.") At the second stage of the *Batson* inquiry, the Court finds that these explanations fall within the Supreme Court's definition of being race-neutral.

■ In the third stage, it is for the trial court to decide the ultimate question of whether the defendant has proved that the prosecutor's challenges were, in fact, motivated by race. *Hernandez,* 500 U.S. at 359. The First Circuit stated in *Perez* that the trial court must choose whether to believe the prosecutor's race-neutral explanation or to find that the explanation was a pretext to cover a race-based motive. *Perez,* 35 F.3d at 635. This determination turns upon an assessment of the credibility of the prosecutor's

explanation, the best evidence of which will often be the demeanor of the attorney who exercises the challenge. *Id.* Since evaluation of the prosecutor's state of mind based upon demeanor and credibility lies peculiarly within the trial judge's province, the trial court's decision on the ultimate issue of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal. *Id.*

■ Petitioner argues that the prosecutor's asserted race-neutral explanations were a mere pretext for a race-based motive. Specifically, petitioner contends that although youth was a factor cited by the prosecutor, the government allowed other jurors as young or younger than the challenged jurors to be seated. Jurors 1–3 and 5–2 were both 21 years of age. Petitioner argues that the government allowed three jurors who were 19, 22, and 26 years of age to remain on the jury. The record reflects that the prosecutor did not challenge Jurors 1–3 or 5–2 solely on the basis of age, but coupled their youth with other factors. The prosecutor stated that Juror 1–3 appeared very tentative during voir dire and may not have been able to decide the difficult issues presented in the case. The prosecutor stated that he challenged Juror 5–2 for a "constellation of issues" including his age, that he was a full time student, and his manner of dress. Petitioner argues that the explanation based on Juror 5–2 wearing a sweatshirt was a sham because his dress was not much different from the dress of other members of the venire. On this point the trial judge was present in the court room and was in the best position to compare the dress of other jurors.

In addition to the juror's youth, petitioner argues that the use of a juror's education was also a pretext for a race-based motive. Specifically, petitioner argues that, similar to Juror 1–15, several other members of the venire had limited education or had failed to fill out their educational history in the jury questionnaire. The prosecutor stated that he challenged Juror 1–15, not only because of her ninth grade education, but also because she had been involved in a domestic relations injunction and had no real world work experience. Additionally, petitioner argues that the contradictory explanations based on edu-

cation for Juror 1–15 and Juror 5–2 illustrates that they are a pretext for a race-based motive. The prosecutor was concerned that Juror 1–15's limited educational background, coupled with her involvement with a domestic relations injunction, would affect her ability to decide the difficult issues presented at trial. In contrast, the prosecutor's reason for striking Juror 5–2, the full-time student, was not based on the fact that he was "too educated" but rather the fact that young students tend to lack practical experience and hold more liberal views.

■ In a habeas corpus proceeding in federal courts, the factual findings of state courts are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. The trial judge accepted the race-neutral explanations of the prosecutor. The Supreme Judicial Court concluded that the trial judge's determination—that the defendant's right to a jury selected on a nondiscriminatory basis was not violated—was not erroneous. *Latimore,* 423 Mass. at 138–139, 667 N.E.2d 818. This Court concludes that "[t]he trial court did not commit clear error in choosing to believe the reasons given by the prosecutor." *Hernandez,* 500 U.S. at 372.

Moreover, Judge Brady expressly asked all potential jurors during voir dire whether they had any feelings about the different races of the victim and defendant that may affect their judgment. The court excused at least five potential jurors for cause on the basis of their answers to this question. In *Brewer v. Marshall,* 119 F.3d 993, 1005 (1st Cir.1997), the First Circuit stated that "Such a voir dire creates a 'high probability that the individual jurors seated in a particular case were free from bias,'" quoting *Allen v. Hardy,* 478 U.S. 255, 259, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). Therefore, petitioner is not entitled to habeas corpus relief on Ground One.

B. *Reasonable Doubt Jury Instruction*

■ In Ground Two, petitioner claims that the trial court's reasonable doubt instruction defined proof beyond a reasonable doubt solely in terms of a "moral certainty"

with no other explanation, in violation of his due process rights guaranteed by the Fourteenth Amendment. The Due Process Clause requires that the government prove a criminal defendant's guilt beyond a reasonable doubt, and trial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires. *Victor v. Nebraska*, 511 U.S. 1, 21, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). Petitioner's reliance on the United States Supreme Court's decision in *Victor* is misplaced. The Supreme Judicial Court considered the reasonable doubt instruction in this case, and approved the trial court's instruction as "substantially based on the language of *Commonwealth v. Webster*, 5 Cush. [59 Mass.] 295, 320 (1850), which was ruled constitutional by the United States Supreme Court in *Victor v. Nebraska.*" *Latimore*, 423 Mass. at 139–140, 667 N.E.2d 818.

The challenged instruction uses the term "moral certainty" twice. The first usage was in language almost identical to the language approved by the Supreme Court in *Victor*. The Court in *Victor* stated that "Instructing the jurors that they must have an abiding conviction of the defendant's guilt does much to alleviate any concerns that the phrase moral certainty might be misunderstood in the abstract." *Victor*, 511 U.S. at 21. The trial judge's specific instruction was "A charge is proved beyond a reasonable doubt if after you have compared all of the evidence you have in your minds an abiding conviction to a moral certainty that the charge is true." Here the use of the term "an abiding conviction" lent content to the otherwise potentially ambiguous use of the term "moral certainty" by itself. *Victor*, 511 U.S. at 14.

The trial judge's second use of the term "moral certainty" couched the language "reasonable and moral certainty" in terms of the evidence.[1] Accordingly, there is no reasonable likelihood that the jury would have understood moral certainty to be disassociated from the evidence in the case. *Victor*, 511 U.S. at 14. This Court concludes that the instruction informs the jury that the evidence

must be strong enough to prove the defendant's guilt beyond a reasonable doubt. Therefore, petitioner is not entitled to habeas corpus relief on Ground Two.

### C. Prosecutorial Misconduct

■ Petitioner contends that he was deprived of his constitutional right to a fair trial because, while the second trial was pending, the government rejected the petitioner's offer to make an *"Alford"* plea to manslaughter. The district attorney declined the offer, partly because the victim's family wanted the Commonwealth to pursue a murder conviction. The Supreme Judicial Court rejected this claim. *Latimore*, 423 Mass. at 135–137, 667 N.E.2d 818.

■ It is well established that prosecutors possess broad discretion in determining whom to prosecute and what charges to file. *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996). A prosecutor's discretion, however, is subject to some restraints. One of these constraints is that the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classifications. *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). The Supreme Court cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one. *Armstrong*, 116 S.Ct. at 1486. In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." *Id.*

In the present case petitioner does not allege that he was prosecuted on the basis of race, but that the prosecutor based his decision on the considerations of the victim's family. The Supreme Judicial Court concluded that the family's concerns and desires are not the sort of impermissible motives which justify judicial inquiry into the district attorney's exercise of discretion. *Latimore*, 423 Mass. at 136, 667 N.E.2d 818. The Supreme Judicial Court noted that Massa-

---

1. "Instead, the evidence must convince you of the defendant's guilt to a reasonable and moral certainty; a certainty that convinces your under-

standing and satisfies your reason and judgment as jurors who are sworn to act conscientiously on the evidence."

chusetts General Laws specifically provide that victims may make a statement to the court as to the impact of the crime as a factor to be considered in imposing sentence. The Supreme Judicial Court reasoned that, similarly, a district attorney may consider the harm and impact to the victim and a victim's family when deciding whether to accept a plea to a lesser charge. The Supreme Judicial Court's decision was not contrary to any clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). Therefore, petitioner is not entitled to habeas corpus relief on Ground Four.

### D. *Due Process and Speedy Trial*

Petitioner contends that being retried for an offense seventeen years after first being convicted for that offense amounted to an unreasonable delay in violation of Due Process under the Fourteenth Amendment and of his Sixth Amendment right to a speedy trial. The Supreme Judicial Court held that petitioner's right to due process was not offended because the delay was not prejudicial and that the right to a speedy trial was inapplicable. *Latimore,* 423 Mass. at 133–135. This Court recognizes that a significant period of time elapsed between the affirmation of his conviction in the first trial and his subsequent retrial. After a careful examination of the record, however, this Court concludes that the Supreme Judicial Court's decision was not contrary to clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).

Petitioner contends that the period beginning August 7, 1979, the date his first conviction was affirmed by the Supreme Judicial Court, and ending November 18, 1992, the date the single justice of the Supreme Judicial Court denied the Commonwealth's application to appeal the order for retrial presents an unusual situation requiring application of the Sixth Amendment right to a speedy trial in conjunction with a post-conviction right to due process. Petitioner characterizes that interval as a "delay of the prospective retrial." The Sixth Amendment provides that "[i]n all criminal prosecutions,

the accused shall enjoy the right to a speedy and public trial...." The Sixth Amendment right to a speedy trial is not primarily intended to prevent prejudice to the accused caused by passage of time; that interest is protected primarily by the Due Process Clause. *United States v. MacDonald,* 456 U.S. 1, 8, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982). The right to a speedy trial is concerned only with the period between a defendant's indictment or arrest and his trial. *Id.* 456 U.S. at 8–9. Therefore, the right does not apply to the appellate process. Nor does the Sixth Amendment right apply when a conviction is reversed on collateral attack. *United States v. Ewell,* 383 U.S. 116, 121, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). Thus, the right to a speedy trial is not violated by the length of time between the conclusion of the state appellate process and retrial.

Petitioner directs this Court toward a line of cases relating to whether post-conviction appellate delay constitutes a due process violation. *United States v. Mohawk,* 20 F.3d 1480 (9th Cir.1994); *Harris v. Champion,* 15 F.3d 1538 (10th Cir.1994). A number of circuits courts have extended the speedy trial analysis set forth in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to delays arising in the processing of post-conviction appeals. *See United States v. Smith,* 94 F.3d 204, 206–07 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 997, 136 L.Ed.2d 877 (1997); *Simmons v. Reynolds,* 898 F.2d 865, 868 (2d Cir.1990); *Burkett v. Cunningham,* 826 F.2d 1208, 1219–21 (3rd Cir.1987); *United States v. Johnson,* 732 F.2d 379, 381 (4th Cir.), *cert. denied,* 469 U.S. 1033, 105 S.Ct. 505, 83 L.Ed.2d 396 (1984).

In *Barker,* the Supreme Court enunciated a four part balancing test to be used in pre-trial delay cases wherein courts consider: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a timely appeal; and (4) the prejudice to the defendant as a result of the delay. The First Circuit, however, has never explicitly applied *Barker* in analyzing delay in post-conviction appeals. Nevertheless, the First Circuit examines such cases on a case by case basis applying factors similar to those employed in *Barker. See Morales Ro-*

*que v. People of Puerto Rico,* 558 F.2d 606, 607 (1st Cir.1976) citing *Barker v. Wingo,* 407 U.S. at 514; *see also United States v. Pratt,* 645 F.2d 89, 91 (1st Cir.1981). This Court finds that the factors set forth in *Barker* and the subsequent cases modifying it for post-conviction appeals provide the relevant standard for determining the constitutionality of delay in the present case.

 The Tenth Circuit in *Harris v. Champion,* elaborated on the *Barker* test in the context of post-conviction appeal delays and provided a well reasoned framework for evaluating alleged violations of a defendant's post-conviction due process right. *Harris,* 15 F.3d at 1558–65. The modified test applies the four factors of the *Barker* test, but tempers the fourth factor to "reflect the interest sought to be protected by an appeal 'unencumbered by excessive delay.'" *Harris,* 15 F.3d at 1559. The modified test requires consideration of whether the petitioner was prejudiced by the delay because he (1) suffered oppressive incarceration pending appeal; (2) suffered constitutionally cognizable anxiety and concern while awaiting the outcome of his or her appeal; and (3) had the grounds for his appeal or his defense in the event of reversal and retrial impaired. *Harris,* 15 F.3d at 1559. This approach places additional emphasis on the prejudice prong of the *Barker* analysis. In the present case any prejudice to petitioner based on delay before his retrial will be analyzed under the *Barker* test as modified by *Harris.*

### III. *Length of the Delay*

 In applying the modified *Barker* test to the facts of the instant case, this Court first must determine the relevant period of delay in question. Petitioner contends that the applicable time period is the entire seventeen years from the date of his first conviction, May 24, 1976, to the date of his retrial, October 12, 1993. This seventeen-year period, however, must be analyzed to properly determine the prejudice to petitioner due to delay caused by the government. From his indictment on October 29, 1975, to the affirmation of his conviction by the Supreme Judicial Court on August 7, 1979, petitioner's case properly worked its way through the

judicial process. These 45 months are excluded as a period of delay attributable to either the government or petitioner. Following the affirmation of his conviction in the first trial by the Supreme Judicial Court, petitioner did not file a motion for a new trial in the Superior Court until May 6, 1982. These 33 months are attributable solely to petitioner.

Moving forward, petitioner filed a second motion for a new trial on June 28, 1991, which was granted on August 13, 1992. The Commonwealth's application for leave to appeal was denied by a single justice of the Supreme Judicial Court on November 18, 1992. Prior to the retrial, petitioner filed several motions for continuance. The retrial commenced on October 12, 1993. The 11 months from the denial of the Commonwealth's application for leave to appeal to the commencement of the retrial cannot be attributed to the government.

Thus, the Court rules that the crucial time period for determining prejudice is the period which elapsed between November 22, 1983, the date of the denial by a single justice of the Supreme Judicial Court of petitioner's application for leave to appeal the denial of his first motion for a new trial, and November 18, 1992, the date of the denial by a single justice of the Supreme Judicial Court of the Commonwealth's application for leave to appeal the granting of the petitioner's second motion for a new trial.

This period of nine years is sufficient to trigger further inquiry. *See e.g., Smith,* 94 F.3d at 206–07 (three-year delay sufficient to trigger inquiry); *Mohawk,* 20 F.3d at 1484 (ten-year delay "is 'extreme' by any reckoning"); *Champion,* 15 F.3d at 1560 (holding that a two-year appellate delay will create a rebuttable presumption of unconstitutionality); *Reynolds,* 898 F.2d at 868 (six years "was clearly excessive"); *Johnson,* 732 F.2d at 381 (two-year delay "is in the range of magnitude" for triggering inquiry).

### IV. *Reason for the Delay*

The Court must determine the reason for the delay during this nine year period and whether it impaired petitioner' grounds for a

defense in the retrial. As explained in *Barker*, "different weights should be assigned to different reasons":

A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

The nine-year period in question commenced in 1983 when petitioner sought leave from a single justice of the Supreme Judicial Court to appeal the denial of his first motion for a new trial. That application was denied on November 22, 1983 by Justice Nolan. On March 19,1984 petitioner filed a motion for reconsideration of Justice Nolan's denial of his application for leave to appeal, which was denied on April 11, 1984. Petitioner contends that Justice Nolan's denial was in error and led to the nine-year delay. The basis for Justice Nolan's denial of the petitioner's application for leave to appeal and petitioner's subsequent assertions of right to appeal demand examination.

Justice Nolan denied petitioner's application for leave to appeal on the procedural ground that petitioner had failed to raise his objection to the jury instructions on the direct appeal of his first conviction. Petitioner appealed his first conviction on the grounds that it was error for the trial judge to deny his separate motions for directed verdicts of not guilty, of not guilty of murder in the first degree, and of not guilty in the second degree. *Commonwealth v. Latimore*, 378 Mass. 671, 671–72, 393 N.E.2d 370 (1979).

Petitioner first raised the issue of error in the jury instructions in his first motion for a new trial before Judge Hurd in Superior Court on May 6, 1982. Judge Hurd denied the motion on January 18, 1983. In denying petitioner's first motion for a new trial, Judge Hurd stated that "the jury instruction may be open to criticism were it not for the context in which it was uttered." After re-

viewing the jury instruction as a whole, Judge Hurd concluded that "there was no danger that a reasonable juror might have interpreted the judge's instruction as creating a constitutionally impermissible presumption or as requiring the defendant to disprove malice."

After the denial of his application for leave to appeal on April 11, 1984, petitioner took no action for over five years. In his first motion for a new trial petitioner had argued, under the principles of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), that the trial judge's instruction on the issue of malice created an unconstitutional presumption relieving the state of its affirmative burden of proof. *Sandstrom*, 442 U.S. at 523. Subsequent to the denial of petitioner's first motion for a new trial in 1983, the United States Supreme Court clarified *Sandstrom* in *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The *Francis* Court addressed itself to "the limited category of criminal prosecutions in which intent is the pivotal element of the crime charged and the only contested issue at trial." *Id.* 471 U.S. at 309. The Court in *Francis* held that "contradictory instructions as to intent—one of which imparts to the jury an unconstitutional understanding of the allocations of burdens of persuasion—create a reasonable likelihood that a juror understood the instructions in an unconstitutional manner, unless other language in the charge explains the infirm language sufficiently to eliminate this possibility." *Francis*, 471 U.S. at 324 n. 8. The Court reasoned that if such a reasonable possibility of an unconstitutional understanding exists, "we have no way of knowing that [the defendant] was not convicted on the basis of the unconstitutional instruction." *Francis*, 471 U.S. at 324 n. 8, quoting *Sandstrom*, 442 U.S. at 526.

Petitioner, believing Justice Nolan's denial of his application for leave to appeal was not based on procedural grounds, filed a Petition for a Writ of Habeas Corpus in federal court on October 23, 1989. On February 21, 1990, Justice Nolan entered an amended order, *nunc pro tunc* to November 23, 1983, stating, "The application for leave to appeal is denied for reasons of procedural default." Petition-

er subsequently withdrew his federal habeas corpus petition.

Petitioner filed a second motion for a new trial on June 28, 1991. In ruling on petitioner's second motion for a new trial, Judge Nixon ruled that the jury instructions were unconstitutional and ordered a new trial, basing his decision on *Francis.*

Similar to Justice Wilkins' concurring opinion in *Latimore,* 423 Mass. at 139, 667 N.E.2d 818, the Court is concerned by the length of the delay between Justice Nolan's denial of the petitioner's application for leave to appeal the denial of his first motion for new trial and Judge Nixon's granting of a new trial. ("I am troubled that the inordinate delay in petitioner's retrial was caused by the failure of the process for permitting appellate review of post-conviction challenges.")

Judge Nixon stated in his Memorandum and Order granting a new trial that "with due deference and respect for Justice Nolan's decision, I rule that defendant's claim of error on the issue of the malice instruction given at his trial was initially lost, but was, however, resurrected for appellate review after Judge Hurd considered the merits of this claim in the context of a motion for a new trial." The Court cannot overlook the fact that petitioner's application for leave to appeal his denial of his first motion for a new trial was erroneously denied on purely procedural grounds when his claim was viable according to Judge Nixon. The nine-year delay in the appellate process, thus, must be determined under the prejudice prong of the modified *Barker* analysis to determine whether petitioner's right to due process was violated.

## V. *Assertion of the Right*

The third factor the Court must consider in determining whether a due process violation has occurred is the petitioner's assertion of his right to a timely appeal. The Supreme Court rejected in *Barker* "the rule that a defendant who fails to demand a speedy trial forever waives his right." 407 U.S. at 528. Instead, the Supreme Court held that whether and how strongly a defendant asserts his right to a speedy trial should be balanced

with the other factors. *Id.* at 528–529. A criminal defendant who has already been convicted usually wants a speedy appeal and has little or no incentive to the delay the outcome. Therefore, we presume that petitioner desired a timely appeal.

During the period from 1982 to 1991, petitioner was heard in state court on a motion for a new trial, and on an application for leave to appeal the denial of his motion for a new trial, and he filed a habeas corpus petition in federal court. Under these circumstances, the filing of these motions constitutes a sufficient assertion of petitioner's right to a timely appeal.

## VI. *Prejudice*

■ In determining prejudice petitioner submits that the Supreme Judicial Court incorrectly applied the *Doggett* standards in this case. The Supreme Court in *Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), held that, in the context of an eight and a half year delay between defendant's indictment and his subsequent arrest, a defendant need not prove prejudice in order to succeed in gaining dismissal of the charges on speedy trial grounds. In cases involving such an inordinate pretrial delay, prejudice is presumed. *Id.* 505 U.S. at 655. The Supreme Court stated that "We generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* at 655. The circuit courts have sent conflicting signals as to whether *Doggett* should apply to post-conviction appellate delay. *Smith,* 94 F.3d at 212 ("In our view, there is no reason why *Barker*'s speedy trial analysis should apply to cases of appellate delay but *Doggett*'s speedy-trial presumption of prejudice should not."); *Mohawk,* 20 F.3d at 1487–88 (*Doggett* analysis is "inapposite" to appellate delay claims); *Heiser v. Ryan,* 15 F.3d 299, 304 (3rd Cir.) (Uncertain as to *Doggett*'s relevance), *cert. denied,* 513 U.S. 926, 115 S.Ct. 313, 130 L.Ed.2d 276 (1994).

■ The reasons for presuming prejudice in the *Doggett* situation simply do not apper-

tain to circumstances where the delay has occurred between the affirmation of conviction on appeal and a subsequent new trial. When a full trial has occurred, even if there is an inordinate post-trial delay, the record of the trial is preserved. The Court agrees with the Ninth Circuit that petitioner must make some showing on the fourth factor—prejudice—to establish a due process violation. *United States v. Tucker,* 8 F.3d 673, 676 (9th Cir.1993) (en banc), *cert. denied,* 510 U.S. 1182, 114 S.Ct. 1230, 127 L.Ed.2d 574 (1994). Therefore, the *Doggett* presumption of prejudice is not applicable here and petitioner must establish that the delay has caused an impairment of his ability to present his arguments effectively at retrial. *Mohawk,* 20 F.3d at 1487–88.

The burden is on petitioner to demonstrate that any delay impaired his grounds for defense at the retrial.[2] Petitioner contends that the "particularized trial prejudice" was the use of the trial transcripts from the first trial at retrial in place of three live witnesses who could not be cross-examined. All of the prosecution's eyewitnesses, except for one, were unavailable at retrial. In general, the unavailability of key prosecution witnesses increases the difficulty of the government's burden. Reading trial transcripts into evidence is not as effective as in-court live testimony. The Court of Appeals for the Ninth Circuit in *Mohawk* noted that the risk of prejudice after a full-fledged adversarial proceeding is less because there is a complete and reliable record. *Mohawk,* 20 F.3d at 1488. Petitioner argues that *Mohawk*'s reasoning is not applicable because his trial counsel in the first case did an ineffective job of cross-examination of the three unavailable witness. In particular, petitioner contends that the focus of the cross-examination at the first trial was the witnesses' ability to identify petitioner. The Sixth Circuit in *Smith* questioned *Mohawk*'s reliance on evidence obtained in the first trial because the whole point of retrial is that there was something

materially wrong with the original trial. 94 F.3d at 212. The court in *Harris* stated that "[A]n appeal that is inordinately delayed is as much a 'meaningless ritual' as an appeal that is adjudicated without the benefit of effective counsel or a transcript of the trial court proceedings." *Harris,* 15 F.3d at 1558. Petitioner's claim that the witnesses were not fully cross-examined in the first trial raises serious due process concerns.

The issue of ineffective assistance of counsel in the first trial was not raised on direct appeal nor was it argued in the proceedings before Justice Nolan in 1983. In petitioner's second motion for a new trial on June 28, 1991, he argued that "The defendant was denied his constitutional rights to the effective assistance of counsel during his trial and especially on his direct appeal by counsel's failure to object to and raise on direct appeal the clearly reversible error in the trial's judge's reasonable doubt instruction." Judge Nixon based his ruling for a new trial solely on the erroneous jury instruction and did not address the ineffective assistance of counsel claim. For habeas corpus relief based on ineffective assistance of counsel to be warranted a petitioner must demonstrate that there was a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The nine-year delay resulted in two eyewitnesses[3] to the crime, the bar owner and a patron, being unavailable to testify at retrial, thus necessitating the use of the first trial transcript of these witnesses' testimony. Thus, the sole question before the Court is whether the use at retrial of the transcripts of the first trial testimony of two unavailable eyewitnesses was prejudicial to petitioner at the second trial.

The Supreme Judicial Court based its determination that there was no due process

---

**2.** This Court only addresses prejudice impairing the grounds for his defense in the retrial. Petitioner does not raise prejudice based on that he suffered oppressive incarceration pending appeal or that he suffered constitutionally cognizable anxiety and concern while awaiting the outcome of his or her appeal.

**3.** The patron's wife was also unavailable, but the transcript of her first trial testimony was introduced by the defendant in the second trial.

violation by the delay in retrial on the availability of the transcripts from the first trial. The Supreme Judicial Court followed the reasoning established by the Ninth Circuit in *Mohawk*. Whereas "delay of an initial trial compromises reliability because of the risk that exculpatory evidence will be lost—either through the death, disappearance, or fading memory of witnesses.... At a second trial, however, '[i]f important witnesses have become, for one reason or another, unavailable, their former testimony may be introduced at the second trial....'" *Latimore*, 423 Mass. at 134, 667 N.E.2d 818, quoting, *United States v. Mohawk*, 20 F.3d 1480, 1488 (9th Cir.1994).

It is axiomatic that delay resulting in the unavailability of prosecution witnesses usually prejudices the prosecution. This was substantiated here where the retrial resulted in a verdict of second-degree murder rather than in a verdict of first degree murder, which had been obtained in the first trial.

A review of the first trial testimony of the two unavailable eyewitnesses shows that the cross-examination established that the bar owner, Joseph Kmiec, did not see the fight start and only observed petitioner and the victim fighting on the floor. The testimony of a bar patron, Edward Doherty, that petitioner "pushed" the victim before the fight ensued was also probed on cross-examination. Doherty furthered testified on cross-examination that he did not see anything in petitioner's hands. Neither witness testified about anyone possessing a knife nor anyone doing the actual stabbing. The cross-examination reinforced the theme that these two witnesses did not closely observe the fight itself. The petitioner's assertion that the cross-examination of these two witnesses focused solely on identification is incorrect. Petitioner exercised his right to full cross-examination at the first trial.

It is important to note that another bar patron, Paul Salamon, testified at both trials. At each trial Salamon's testimony provided the crucial description of the fight and the victim's reaction on realizing he had been stabbed. During retrial, Salamon was cross-examined regarding any possible bias he might possess because he was a friend of the victim.

The Court acknowledges that it is concerned by the delay suffered by petitioner and the consequent unavailability of the two eyewitnesses at the second trial. Petitioner, however, suffered no prejudice as he was fully accorded his right to cross-examination at the first trial which was preserved by transcript for production at the retrial. After careful review of the trial transcripts and the parties' briefs and oral arguments, the Court concludes that based on the clearly established law as determined by the United States Supreme Court no violation of petitioner's due process right can be found.

## VII. CONCLUSION

For all of the foregoing reasons, the habeas corpus petition is denied and is hereby dismissed.

SO ORDERED.