PER CURIAM.
This case involves an application of Florida’s Involuntary Civil Commitment of Sexually Violent Predators Act, commonly known as the Jimmy Ryce Act, to Ronald Morel, who has been detained by the State of Florida and awaiting a civil commitment trial pursuant to that Act since April 2002. After nearly seven years of pretrial detention at the Florida Civil Commitment Center (FCCC) in DeSoto County, Morel filed a pro se petition for a writ of habeas corpus in the circuit court, seeking full access to the comprehensive sexual offender treatment program (SOTP) made available only to those persons for whom commitment orders have already been entered.
Following the circuit court’s denial of his habeas petition, Morel appealed to the Second District Court of Appeal. On appeal, the Second District certified to this Court that the constitutional issues raised by the circuit court’s judgment, including questions regarding what was at that point an “eight-year delay in [Morel’s] treatment and trial,” affected the proper administration of justice throughout the state and required immediate resolution by this Court. In re Commitment of Morel, 67 So.3d 1062, 1064 (Fla. 2d DCA 2010). We accepted jurisdiction pursuant to article V, section 3(b)(5) of the Florida Constitution and relinquished jurisdiction to the Seventeenth Judicial Circuit Court for the purpose of conducting an evidentiary hearing on Morel’s claims in the court where his Jimmy Ryce proceedings were pending. See Morel v. Sheldon, 59 So.3d 1082 (Fla.2011).[1]
Jurisdiction has returned to this Court, and we now affirm the denial of habeas corpus relief. We hold that (1) neither the Jimmy Ryce Act nor the Constitution entitles Morel to the treatment he seeks as a noncommitted detainee; (2) Morel has failed to establish that the FCCC treatment program is constitutionally defective; and (3) because the delay in Morel’s commitment trial has been made for tactical reasons at his own request, his detention did not result in a constitutional violation. Despite our holding in this case, we emphasize that even though Morel sought the delays in trial, neither the legislative scheme nor the Florida Rules of Civil Procedure for Involuntary Commitment of Sexually Violent Predators (Jimmy Ryce Rules of Procedure) contemplate extended delay in a detainee being brought to trial under the Jimmy Ryce Act.
*228 Accordingly, we urge all trial courts to take immediate steps to ensure that these cases are timely tried in accordance with the intent of the Legislature and Jimmy Ryce Rules of Procedure. We refer this matter to the appropriate rules committees to make recommendations as to whether Jimmy Ryce Rule of Procedure 4.240 should be further amended.
I. BACKGROUND
In March 1996, Morel was sentenced in the Seventeenth Judicial Circuit Court in Broward County to ten years’ imprisonment following his adjudication of guilt for several sexually violent offenses.[2] While he was serving his sentence, the circuit court granted a postconviction motion that Morel filed, the result of which reduced the term of his sentence by approximately three and half years and made him immediately eligible for release.
Due to the nature of Morel’s underlying criminal offenses, his eligibility for release triggered his transfer from a Broward County jail to the custody of the Department of Children and Family Services (DCF) on April 18, 2002, for a determination of whether he should be subject to involuntary commitment as meeting the definition of a “sexually violent predator” under the Jimmy Ryce Act. In accordance with the Act’s immediate release provisions set forth in section 394.9135, Florida Statutes (2002), Morel was then transferred to the FCCC in DeSoto County, which is located within the Twelfth Judicial Circuit.
While he was at the FCCC, Morel’s release from custody was placed on a seventy-two-hour hold in order for DCF’s multidisciplinary team to evaluate Morel, make a written assessment, and offer a recommendation to the state attorney in Broward County regarding whether Morel should be committed as a sexually violent predator. After an evaluation, two psychologists determined that Morel met the criteria of being a sexually violent predator and that he required intensive treatment before being released into the community. Four other members of DCF’s multidisciplinary team concurred with the psychologists’ determination, and the team issued its written recommendation and report.
On April 23, 2002, upon receipt of the multidisciplinary team’s report, the state attorney filed a petition in the Seventeenth Judicial Circuit Court, alleging that Morel met the criteria for commitment. That same day, the trial court issued an ex parte order finding probable cause to believe that Morel was a “sexually violent predator” as defined in section 394.912, Florida Statutes (2002), and thus “eligible for commitment,” and ordered DCF to hold Morel pursuant to section 394.915, Florida Statutes (2002).
At an April 29, 2002, hearing in the Seventeenth Judicial Circuit Court, Morel was present and found to be indigent., Consequently, the circuit court appointed the Office of the Public Defender to represent Morel, and an assistant public defender was there to represent him. After consultation with counsel, Morel agreed in open court to waive his right under section 394.916(1), Florida Statutes (2002), to have a commitment trial held within thirty days of the court’s probable cause determination, and he executed a written waiver to the same effect.
*229 For the reasons discussed in more detail below, after waiving the thirty-day deadline in April 2002, Morel’s Jimmy Ryce trial was delayed for nearly ten years. During that time period, Morel remained a noncommitted, pretrial detainee in the custody of DCF and housed at the FCCC amongst other detainees and committed residents. As opposed to noncommitted detainees, committed residents, who have been adjudicated as sexually violent predators, have access to the full range of comprehensive sexual offender treatment DCF offers through its independent contractor, GEO Group, Inc. (GEO).[3]
On February 10, 2009, although represented by private counsel in his ongoing civil commitment proceedings pending in the Seventeenth Judicial Circuit Court, Morel filed a pro se emergency petition for habeas corpus in the Twelfth Judicial Circuit Court, naming the Secretary of DCF as respondent. In his petition, Morel primarily asserted that due to a policy excluding noncommitted detainees from participation, DCF was unconstitutionally denying him full access to the sexual offender treatment program. Morel claimed that because successful completion of the treatment program is a prerequisite to a resident’s release, DCF’s decision to refuse him complete access to the treatment program was impeding his efforts to secure release from indefinite detention. As a remedy, Morel sought total discharge from detention and dismissal of the State’s civil commitment petition with prejudice. Without conducting a hearing, the trial court entered an unelaborated order denying Morel’s habeas petition on April 1, 2009.
When Morel appealed the judgment of the Twelfth Judicial Circuit Court to the Second District, the district court was troubled by the undisputed eight-year delay in Morel receiving treatment and proceeding to trial. See In re Commitment of Morel, 67 So.3d 1062, 1063-64 (Fla. 2d DCA 2010). The district court noted that it lacked any information about the cause of such delay and observed that “it is not unusual for both the circuit court in DeSo-to County and [the Second District Court] to have no territorial jurisdiction over the forum in which the civil proceeding is pending.” Id. at 1063. The Second District further observed that although this case was “an extreme example,” from its “anecdotal experience, it [was] not unique.” Id. at 1064. Although the Jimmy Ryce Act contemplates that detainees will receive a speedy trial and then annual reviews upon commitment, the Second District explained that once the right to a trial within thirty days is waived, these proceedings “often seem to take many years.” Id. The district court reasoned that if DCF were not providing treatment during this delay, then “a pretrial detainee may not actually hold the keys to the cell in which he is civilly detained.” Id.
Because it lacked territorial jurisdiction over the Seventeenth Judicial Circuit Court where Morel’s Jimmy Ryce proceedings were pending, the Second District expressed concern over how this matter could be fairly resolved for all parties without a hearing involving that circuit court. Id. Noting that the facts of this case raised substantial questions concerning the constitutionality of Morel’s Jimmy Ryce pro *230 ceedings, as well as those proceedings involving other individuals detained at the FCCC, the Second District certified the circuit court’s judgment as having a great effect on the proper administration of justice throughout the state and requiring this Court’s immediate resolution. Id. at 1062-64.
After receiving the Second District’s certification, this Court concluded that the failure to receive treatment as a pretrial detainee and the failure to have held a civil commitment trial for eight years presented serious questions as to the functioning of this state’s system for civil commitments and the legality of Morel’s continued confinement. See Morel v. Sheldon, 59 So.3d 1082, 1083 (Fla.2011). Given these concerns, the Court temporarily relinquished jurisdiction to the Seventeenth Judicial Circuit Court, where Morel’s civil commitment proceedings were actually pending, to conduct an evidentiary hearing to resolve the following factual issues:
a. Whether Morel’s allegations in his petition regarding the inability to receive treatment because of his pretrial detainee status are accurate and to obtain details regarding the issues surrounding treatment (or lack thereof) for pretrial detainees awaiting civil commitment trials;
b. Whether Morel’s allegations in his petition regarding the waiting list to obtain treatment, even if eligible for treatment, are accurate and, if not, explain;
c. Whether Morel’s commitment is illegal or unlawful because of the inordinate amount of time (eight years) since his release from his prison sentence; and
d. The reason why the trial in this case has not taken place for eight years and whether Morel has had counsel throughout that time, and if not, the reasons for lack of counsel.
Id. at 1084.
After conducting a two-day evidentiary hearing, during which nine witnesses testified,[4] the circuit court issued a comprehensive order with extensive findings of fact and conclusions of law. The circuit court provided detailed answers to this Court’s questions, concluding as follows: (1) as a pretrial detainee, Morel is not provided the full panoply of sex offender specific treatment, but is eligible for a variety of other treatment offerings; (2) there are no waiting lists for treatment, but for valid reasons, gaps in time exist between specific programs in the first phase of treatment; (3) neither the Act nor the Constitution requires access to all four phases of treatment, and Morel’s detention has been lawful; and (4) the delays in Morel’s commitment trial have been made for tactical reasons at his own request, he has never requested a commitment trial, and during the course of the delay, Morel has been *231 consistently represented by counsel. Based on these findings, the circuit court determined that Morel’s commitment trial should move forward because counsel had explored all reasonable avenues to secure his release. We now address Morel’s arguments on appeal.
II. ANALYSIS
In support of reversing the Twelfth Judicial Circuit Court’s denial of habeas relief, Morel raises the following three claims: (1) denying him treatment because of his pretrial detainee status violates his rights to due process and equal protection; (2) because of the delays residents experience before receiving treatment, the sexual offender treatment program at the FCCC is constitutionally defective; and (3) Morel’s confinement is illegal based upon the inordinate amount of time Morel has remained a pretrial detainee since release from his prison sentence.[5]
Our review of these issues involves a mixed question of law and fact. The circuit court made findings of fact regarding the exact parameters of the sexual offender treatment program that DCF offers to FCCC residents through GEO, as well as the cause of the delay in Morel’s treatment and trial. The circuit court then determined whether the factual circumstances surrounding Morel’s pretrial detention amounted to a constitutional violation. Therefore, where, as here, the circuit court has conducted an evidentiary hearing, we employ a two-step approach, deferring to the factual findings of the trial court that are supported by competent, substantial evidence, but reviewing the application of the law to the facts de novo. See Twilegar v. State, 42 So.3d 177, 192 (Fla.2010) (“If the ruling consists of a mixed question of law and fact addressing certain constitutional issues ... the ultimate ruling must be subjected to de novo review but the court’s factual findings must be sustained if supported by competent substantial evidence.” (quoting State v. Glatzmayer, 789 So.2d 297, 301 n. 7 (Fla.2001))), cert. denied, _ U.S. _, 131 S.Ct. 1476, 179 L.Ed.2d 315 (2011). Guided by this standard, we first provide an overview of the Jimmy Ryce Act and then separately address each issue Morel raises on appeal, beginning with his claims that center on treatment.
A. The Jimmy Ryce Act
On January 1, 1999, the Jimmy Ryce Act went into effect in Florida, see ch. 98-64, § 24, at 455, Laws of Fla., creating a system whereby individuals determined to be sexually violent predators would be involuntarily committed to the custody of DCF and housed in a secure facility “for control, care, and treatment until such time as the person’s mental abnormality or personality disorder has so changed that it is safe for the person to be at large.” § 394.917(2), Fla. Stat. (2002). The Legislature promulgated the Act for the dual propose “of providing mental health treatment to sexually violent predators and protecting the public from these individuals.” Westerheide v. State, 831 So.2d 93, 112 (Fla.2002) (plurality opinion). Although confinement is based upon a criminal conviction for a sexually violent offense, the Act creates a system of civil, not criminal, detention. See Mitchell v. State, 911 So.2d 1211, 1215 (Fla.2005) (“[I]t is now settled law that the statutes authorizing civil commitment of sexually violent predators (i.e., the Jimmy Ryce Act), are civil.”); see also Kansas v. Hendricks, 521 U.S. 346, 369, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (concluding that Kansas’s Sexually Violent *232 Predators Act establishes a civil rather than a criminal detention scheme).
Commitment proceedings were instituted against Morel pursuant to section 394.9135, Florida Statutes (2002), which provides for expedited procedures when the anticipated release from total confinement “becomes immediate for any reason.” § 394.9135(1), Fla. Stat. When this occurs, “the agency with jurisdiction [here, the Department of Corrections] shall upon immediate release from total confinement transfer that person to the custody of [DCF] to be held in an appropriate secure facility.” Id. Within seventy-two hours of the transfer, a multidisciplinary team of mental health professionals must determine both if the detained person meets the definition of a sexually violent predator under the Act and if he or she suffers from a mental disorder that makes it likely that the person will commit another sexually violent offense if not confined. §§ 394.192, 394.9135(2), Fla. Stat. (2002).
Under these expedited procedures, the state attorney may file a petition with the circuit court alleging that the person is a sexually violent predator within forty-eight hours after receipt of the written assessment and recommendation. § 394.9135(3), Fla. Stat. The filing of the petition triggers a new round of proceedings. If a petition is filed within this applicable timeframe, the judge must then “determinen that there is probable cause to believe that the person is a sexually violent predator.” § 394.9135(1), Fla. Stat. (2002). After a court finds probable cause, “the judge shall order the person be maintained in custody and held in an appropriate secure facility for further proceedings in accordance with this part.” § 394.9135(3), Fla. Stat. The Act does not define the term “secure facility,” but authorizes DCF to contract with a private entity for the use and operation of such a facility. § 394.9151, Fla. Stat. (2002).
As to the procedures prior to trial and commitment, the Act does not contemplate lengthy pretrial detention and provides that a trial to determine whether a person is a sexually violent predator “shall” be conducted within thirty days after the determination of probable cause. § 394.916(1), Fla. Stat. At the time of Morel’s initial confinement in April 2002, section 394.916(2) provided that “[t]he trial may be continued upon the request of either party and a showing of good cause, or by the court on its own motion in the interest of justice, when the person will not be substantially prejudiced.”[6]
At the conclusion of a trial where either the court or a jury determines that the person is a sexually violent predator, he or she “shall be committed to the custody of [DCF] for control, care, and treatment until such time as [his or her] mental abnormality or personality disorder has so changed that it is safe for the person to be at large.” § 394.917(2), Fla. Stat. Subsequent to commitment, persons classified under the Act are periodically examined, at least annually, and a determination is made as to whether he or she may be released safely. See generally § 394.918, Fla. Stat. (2002). In addition, persons committed under the Act have the right to petition for release. § 394.918(2), Fla. Stat. Although the Act expressly provides for the treatment of those against whom a commitment order has been entered, it does not address treatment for those who are in the custody of DCF but awaiting a civil commitment trial. See § 394.917(2), Fla. Stat.
*233 B. The FCCC’s Sexual Offender Treatment Program
As to the treatment that DCF offers to FCCC residents through GEO, Morel raises two claims. Morel first contends that DCF’s current policy of denying him full access to the comprehensive SOTP due to his status as a pretrial detainee violates his rights to due process and equal protection. He next asserts that the FCCC’s operation of the SOTP is defective because of frequent delays residents experience when attempting to obtain treatment.[7] After conducting an evidentiary hearing, the circuit court concluded that Morel’s claims were without merit. We agree with the circuit court’s findings and affirm the denial of relief.

1. Access to Treatment

[1] Morel first asserts that he is being unconstitutionally denied full access to the FCCC’s comprehensive SOTP because he is a pretrial detainee. This claim served as the primary basis for which Morel sought habeas corpus relief. During the time in which Morel’s habeas petition was pending in state court, a class-action suit addressing similar allegations was pending in the United States District Court for the Middle District of Florida. See Canupp v. Sheldon, No. 2:04-cv-260-FTM-99DNF, 2009 WL 4042928, at *1 (M.D.Fla. Nov. 23, 2009), aff'd sub nom. Canupp v. Liberty Behavioral Healthcare Corp., No. 10-10135, 2011 WL 6003986 (11th Cir. Dec.l, 2011). In Canupp, detained and committed FCCC residents alleged the program offered inadequate sexual offender treatment that would allow a realistic opportunity to meet the statutory requirements for release from confinement. Id. Because Morel had neither sought nor consented to treatment at the time of filing, he was ineligible to be a member of the Canupp class.
In response to the Canupp lawsuit, DCF replaced the initial contract provider of mental health services, Liberty, in July 2006 and awarded a contract for the operation and management of the FCCC programs to GEO. DCF addressed the issues raised in the class action by implementing a comprehensive SOTP and a “Final Action Plan.” Id. at *11. In April 2009, DCF opened a state-of-the-art, $62 million facility for the FCCC, and in November 2009, the district court dismissed the class-action suit and did not retain jurisdiction or oversight.
During relinquishment in the present case, it was established that the comprehensive SOTP that GEO now offers to FCCC residents is divided into four phases. In its order, the circuit court set forth the organization and proposed duration of each component of this multitiered treatment program:
The comprehensive SOTP at the FCCC is divided into four phases:
Phase I: Preparation for Change (three programs)
-Moral Recognition Therapy (MRT)
-Thinking for Change (T4C)
-Treatment Readiness for You (TRY)
Phase II: Awareness
*234 -Stage 1-Disclosure
-State 2-Discovery
Phase III: Healthy Alternative Behaviors
Phase IV: Maintenance and Comprehensive Discharge Planning
Assuming a fully engaged and sufficiently motivated participant, the anticipated timeframe for completion of Phase I is between 15 to 18 months, for Phase II from 18 to 24 months, for Phase III from 18 to 24 months, and Phase TV from 6 to 9 months. Thus, a resident could complete the programs in 5 to 5 1/2 years. Residents completing Phase IV of the program are considered to have reached “maximum therapeutic benefit,” which is a measurement of treatment progress. Reaching maximum therapeutic benefit does not necessarily mean that the resident is ready or safe for release.
Findings of Fact Regarding Morel’s Pretrial Detention and Treatment at 18-19 [hereinafter “Findings of Fact”]. In terms of treatment, GEO’s program differentiates between pretrial detainees and all other residents. Until 2005, Liberty offered all residents full access to treatment. When GEO took over, GEO implemented a policy authorizing detainees to participate in a portion of Phase I, the MRT course, but excluding detainees from admittance into the final two courses in Phase I, T4C and TRY, and completely excluding detainees from participation in Phases II, III, and IV. Because detainees are technically not committed, they can never secure maximum therapeutic benefit.
In addition to the comprehensive SOTP, GEO currently offers a variety of other adjunct therapies, which are available to all residents, including detainees. As to these adjunction therapies, the circuit court found as follows:
Phase I is psychoeducational and the subsequent phases are psychother-apeutic. While the comprehensive SOTP Phases II-IV are unavailable to detainees, there are a variety of adjunct therapies and activities available to all residents, including detainees, such as Substance Abuse Education and Treatment, Treatment for Co-Occurring Conditions, Substance Abuse Relapse Prevention, Human Sexuality Education, Emotions Management, Interpersonal Communication, Family Relationships, Health and Wellness, Medication Management, Mental Health Treatment, Lifestyle Management, [Narcotics Anonymous and Alcoholics Anonymous], Personal Victimization, Sexual Thoughts and Fantasies, and Sexual and Interpersonal Violence Awareness. Ml residents, including detainees, may access educational and vocational services including GED and adult education, the computer lab, the law library, as well as recreational and leisure services and activities. Detainees are able to enroll in MRT in Phase I of the SOTP and Dr. Wilson’s Thursday night program. This program was designed to help detainees be more successful in their later treatment.
Findings of Fact at 22.
Morel does not challenge the circuit court’s factual findings. Instead, he asserts that the limited treatment options made available to pretrial detainees are constitutionally inadequate. Because the Act does not expressly provide for sexual offender treatment of noncommitted detainees, we must decide whether the Constitution nevertheless imposes such a requirement, and if so, to what extent. Mthough both this Court and the United States Supreme Court have recognized that civil commitment for any purpose constitutes a significant deprivation of lib *235 erty that requires due process protection, see, e.g., Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); Murray v. Regier, 872 So.2d 217, 221 (Fla.2002), the decisions discussing this issue have never before addressed the exact type of treatment that is constitutionally mandated. See Johnson v. State, 289 Kan. 642, 215 P.3d 575, 583 (2009) (noting that the United States Supreme Court has not established a standard to address challenges to the constitutional adequacy of sexual predator treatment programs).
When discussing state statutes authorizing the commitment of sexually violent predators, the United States Supreme Court has held that “[s]tates enjoy wide latitude in developing treatment regimens.” Hendricks, 521 U.S. at 368 n. 4, 117 S.Ct. 2072 (citing Youngberg v. Romeo, 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (observing that the State “has considerable discretion in determining the nature and scope of its responsibilities”)). Without enunciating the standard to be applied or the type of treatment that is constitutionally required, the Supreme Court in Hendricks upheld Kansas’s statutory scheme for commitment of sexually violent predators given that the legislation’s overriding concern was the continued segregation of sexually violent offenders with the “ancillary goal of providing treatment to those offenders, if such is possible.” Id. at 366, 117 S.Ct. 2072. On the issue of treatment specifically, the Supreme Court explained that it had never held that the Constitution prevents a state from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others:
While we have upheld state civil commitment statutes that aim both to incapacitate and to treat, we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others. A State could hardly be seen as furthering a “punitive” purpose by involuntarily confining persons afflicted with an untreatable, highly contagious disease. Similarly, it would be of little value to require treatment as a precondition for civil confinement of the dangerously insane when no acceptable treatment existed. To conclude otherwise would obligate a State to release certain confined individuals who were both mentally ill and dangerous simply because they could not be successfully treated for their afflictions.
Id. (citations omitted); see also Westerheide, 831 So.2d at 101-02 (adopting this analysis to reject a respondent’s claim that the Jimmy Ryce Act was “holding the untreatable for treatment” since there was a lack of scientific support that such sex offenders could be helped through treatment). In dissent, Justice Breyer explained that some states “begin treatment of an offender soon after he has been apprehended and charged with a serious sex offense,” Hendricks, 521 U.S. at 388, 117 S.Ct. 2072 (Breyer, J., dissenting), implying that states may afford treatment for an alleged sexually violent predator prior to the time of trial and adjudication in commitment proceedings.
In Seling v. Young, 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001), the Supreme Court further observed that “due process requires that the conditions and duration of confinement ... bear some reasonable relation to the purpose for which persons are committed.” The Supreme Court in Young, however, did not address whether those requirements were met, and as in Hendricks, discussed this standard in relation to those individuals for whom commitment orders had already been entered.
*236 In People v. Ciancio, 109 Cal.App.4th 175, 134 Cal.Rptr.2d 531, 544-45 (2003), a California appellate court addressed an issue similar to the one we address here— whether alleged sexually violent predators, who were released from prison and detained in jail pending their commitment trials, are entitled to treatment and housing in a state mental hospital prior to trial. After reviewing relevant Supreme Court precedent, the California court concluded that while there was no pre-commitment right to mandatory treatment for an alleged sexually violent predator prior to the time of trial and adjudication, states did have the discretion to afford such treatment. Id. at 544-46. The court in Cianco determined that California law permitted, although it did not require, trial courts “to order [detainees] to a state hospital, which is a therapeutic environment where treatment is provided.” Id. at 546.
Unlike the California law at issue in Ciando, Florida’s Jimmy Ryce Act neither mandates nor permits trial courts to order that pretrial detainees receive full access to the FCCC’s comprehensive SOTP. Moreover, Morel has not provided any authority for the proposition that noncommit-ted detainees are constitutionally entitled to treatment absent statutory authorization. In rejecting Morel’s challenge, the circuit court applied the leading case on the rights of persons civilly confined to state institutions, Youngberg, and determined that even if Morel had some constitutional right to treatment pending trial, he was not entitled to any specific type of treatment.
The Supreme Court’s decision Young-berg announced a distinct standard to be applied in measuring a state’s constitutional duties to mental incompetents, addressing the extent to which the Due Process Clause imposes upon states an affirmative duty to care for, treat, and protect persons in its custody. 457 U.S. at 324, 102 S.Ct. 2452. There, a mentally retarded individual involuntarily committed in a state hospital brought a suit against state officials, alleging injuries received as a result of his own violence and the reactions of other residents to him, unduly prolonged physical restraints, and a failure to provide him with appropriate treatment for his mental retardation. Id. at 310-11, 102 S.Ct. 2452. The Supreme Court upheld his claims to safe conditions and to freedom from unnecessary bodily restraints. Id. at 315-16, 102 S.Ct. 2452. It found his claim to a “constitutional right to minimally adequate habilitation,” however, to be “more troubling.” Id. at 316,102 S.Ct. 2452.
As to this claim, the Supreme Court in Youngberg first recognized that “[w]hen a person is institutionalized — and wholly dependent on the State,” there exists “a duty to provide certain services and care.” Id. at 317, 102 S.Ct. 2452. The Court then agreed that a committed person is entitled to “minimally adequate or reasonable training to ensure safety and freedom from undue restraint.” Id. at 319, 102 S.Ct. 2452. This measure flowed from the premise that “[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.” Id. at 321-22, 102 S.Ct. 2452. Notably, the Court found it unnecessary to consider “the difficult question [of] whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training per se, even when no type or amount of training would lead to freedom.” Id. at 318, 102 S.Ct. 2452.
The Court in Youngberg further explained that whether a confined patient’s constitutional rights have been violated necessarily depends upon a balancing of *237 his liberty interests against relevant state interests and noted that to ensure uniformity in protecting these various interests, the balancing should not be left to the unguided discretion of a judge or jury. Id. at 321, 102 S.Ct. 2452. Therefore, the Court established a deferential standard, holding that “the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.” Id. (quotation omitted). Emphasizing that treatment and training decisions, if made by a professional, are presumptively valid, the Youngberg Court held that “liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.” Id. at 323, 102 S.Ct. 2452.
Given the lack of clear guidance on which standard to apply, courts have applied various analyses to evaluate the constitutional adequacy of treatment programs for sexually violent predators confined in state custody.[8] We agree with the circuit court, however, that if the Youngberg standard applies, Morel has failed to establish a basis for relief.[9]
*238 In this case, the circuit court concluded that the evidence adduced during relinquishment clearly established valid and substantial reasons for precluding noncom-mitted detainees from fully participating in the FCCC’s comprehensive SOTP, finding as follows:
In September 2005, Liberty closed the comprehensive sex offender treatment program to detainees.[n. 15] In 2006, GEO sex offender treatment experts discussed and debated whether residents who are detained should be permitted to fully .participate in treatment. After consultation with the Treatment Advisory Board, Public Defenders, and others, it was decided that the then existing policy to preclude detainees from Phases II-IV was a professionally sound one. The decision to exclude detainees from the comprehensive SOTP is appropriate for several reasons outlined by the experts. First, participating in treatment beyond the initial MRT program in Phase I requires preparation for full disclosure of the resident’s prior sexual crimes. Full disclosure, in the current treatment paradigm, is made at the beginning of Phase II. Full disclosure is critical to the effectiveness of the treatment program. Committed residents are motivated to make full disclosure of their offender histories (prior deviant sexual behavior) in order to achieve the benefits of the treatment and move forward in the program. Detainees have less motivation for full disclosures because their commitment proceeding[s] are still pending and information disclosed in the clinical records made during treatment can be obtained and used against them at their commitment trial.[n. 16] This causes a conflict for the detainee. There is also an ethical conflict for the therapists for the detainees because the records made of the detainees treatment progress may negatively impact the detainee at trial. Secondly, the lack of candor of the detainees works to degrade the integrity of the program and effectiveness of the group dynamic for those who are committed, consenting, and fully participating. Finally, detainees are more likely to drop out of treatment due to the issues associated with disclosure and the tension created between treatment and the commitment proceedings. Some research studies indicate that those who drop out before completing the treatment phases are more likely to recidivate than those who don’t begin treatment at all.
[[Image here]]
There is no dispute that, other than those grandfathered into the treatment program in September 2005, detainees at the FCCC currently are not permitted to participate in the comprehensive SOTP beyond the MRT group in Phase I. DCF established at the hearing that participation by detainees (1) undermines the integrity and compromises the effectiveness of the SOTP for those committed participants due to the lack of full disclosure by detainees, (2) creates conflicts for the clinical therapists treating the detainees, and (3) presents legal issues for the detainees in their commitment proceedings. This Court finds that these are all valid reasons for excluding detainees from treatment participation based upon the professional judgment of experts in the field.... [T]he Court also finds that, in addition to the MRT group in Phase I, there is an array of adjunct therapeutic groups *239 and services available that would benefit detainees in the context of their commitment proceedings.
Findings of Fact at 20-22, 29. The circuit court then applied the Youngberg standard to its factual determinations and concluded that Morel was not entitled to the treatment he seeks:
To prove a constitutional violation, Morel must demonstrate that FCCC’s practices and administrative or clinical decisions pertaining to treatment are such a substantial departure from accepted professional judgment, practice and standards as to demonstrate that the person responsible did not base the decision on such judgment. Morel has failed to do so. The expert witnesses clearly established why, in their professional judgment, detainees should be excluded from the full panoply of treatment. The FCCC is accredited by [the Commission on Accreditation of Rehabilitation Facilities (CARF) ] and is regularly monitored by a Treatment Advisory Board to insure [its] treatment program meets nationally recognized standards.
[[Image here]]
Under the applicable case law if, in fact, Morel is entitled to treatment there is no constitutional or statutory requirement that he receive sex offender specific treatment. While a duty to provide certain services and care does exist, the State has considerable discretion in determining the nature and scope of its responsibilities. Youngberg, 457 U.S. at 317, 102 S.Ct. 2452.
Findings of Fact at 33-35.
The circuit court’s factual findings are supported by competent, substantial evidence, and we agree with the court’s well-reasoned legal conclusions. The State’s contention that Florida is using treatment that represents the application of reputable professional judgment stands without any serious contest. This Court’s role is not to second-guess the professional judgment of State employees. Morel has not supplied any reason for this Court to conclude that the choices made by DCF, and more specifically GEO, for sexual offender treatment at the FCCC are so far outside the bounds of professional norms that they must be equated with no professional choice at all. We therefore affirm the denial of relief on this claim.
With respect to Morel’s contention that he has been denied the right to equal protection because he is treated differently than those FCCC residents who have been committed, this claim too fails. Under Florida law, “all similarly situated persons are equal under the law and must be treated alike.” Ocala Breeders’ Sales Co. v. Fla. Gaming Ctrs., Inc., 793 So.2d 899, 901 (Fla.2001). By contrast, “[d]ifferent treatment of dissimilarly situated persons does not constitute an equal protection violation.” Meola v. Dep’t of Corr., 732 So.2d 1029, 1037 (Fla.1998) (plurality opinion). Morel is not similarly situated to those FCCC residents for whom commitment orders have already been entered. As the circuit court correctly concluded, pretrial detainees, like Morel, are in a different legal posture than committed residents since “statements made regarding their sexual offenses during treatment could be used against them at a [future] commitment trial.” Findings of Fact at 35. Ac *240 cordingly, there is no equal protection violation.

2. Delays in Treatment

Morel also alleges that GEO’s acknowledgment of delays of up to twenty weeks between classes at the FCCC evidences a defect in the comprehensive SOTP. We reject this claim, as did the circuit court, because Morel’s assertions are directly refuted by the record. The circuit court found the treatment program that GEO implements for DCF to be operating adequately. The court determined that no waiting lists exist and that time gaps in the Phase I modules T4C and TRY occur because the groups move in tracks or cohorts. The court also determined that the FCCC’s sexually violent predator program is fully funded and that Morel’s contentions that extended waiting lists exist because the program is underfunded and insufficiently staffed were unfounded. These findings are supported by competent, substantial evidence. Because the record establishes valid reasons for any perceived delay that occurs during Phase I of the treatment program, Morel has failed to establish that the program is constitutionally defective. We therefore affirm the denial of relief on this claim.
C. Pretrial Delay and Detention
We next address Morel’s contention that the prolonged period of time he has remained confined as a pretrial detainee since release from his prison sentence is illegal. On this issue, the circuit court found that since the State’s initiation of Jimmy Ryce proceedings against Morel, Morel has been consistently represented by counsel and that the protracted delay in his being brought to trial was a tactical choice made at his own request. The circuit court made extensive findings of fact, which chronicled the series of events giving rise to this delay, including Morel’s initial waiver of his right to a commitment trial within thirty days and his subsequent requests for continuances, and ultimately found as follows:
Morel has never wanted trial and at all times, from April 29, 2002, to present, Morel has been represented by counsel.
A petition seeking the involuntary civil commitment of Ronald Morel was filed on April 23, 2002, and an ex parte probable cause order was signed by Judge Robert Carney on the same day. At a hearing on April 29, 2002, the public defender was appointed to represent Morel. Morel signed a waiver of speedy trial. In most instances, a detainee does not want a trial in thirty days.
Extensive discovery and pretrial motions were completed, and the case was placed on the trial docket for July 2005. On Morel’s motion, the case was continued while attorney Cohen [the attorney Morel privately retained in June 2005] tried to set aside his underlying conviction on a Rule 3.850 petition. When that failed, Cohen and State Attorney Kristin Kanner began settlement discussions. The attorneys worked toward a self-commitment contract[10] from 2008 to *241 2010, but negotiations ultimately stalled in late 2010. This case was set for trial on January 24, 2011. Subsequently, a motion for continuance was denied. A renewed defense motion for continuance was granted, and the Supreme Court entered a stay.
Morel has never reasserted his right to trial in thirty days. The State has never prevented Morel from going to trial. The Court has always been available to conduct a trial. Despite the lengthy delays, attorney Cohen claimed she was not ready for trial.
The statute provides for a speedy trial so that if one meets the criteria for commitment [he or she] can obtain long term treatment and care. The reality is Morel seeks to circumvent the clear intent of the statute by avoiding a determination of commitment. For tactical reasons, he wants to avoid trial.
The Second District Court of Appeal expressed concern over the length of time before the Jimmy Ryce Act eases proceed to trial. Those reasons were explored at the hearing. When a person is first detained, the State is ready for trial as it has access to the psychologists who recently assessed the defendant and their reports. The State experts are prepared to testify that the defendant meets the criteria as a sexually violent offender and is likely to re-offend. And a judge is always available to try the case. The defense finds itself at a disadvantage because it would prefer to have an expert witness who will support release of the detainee and testify that the detainee is not likely to re-offend. From the detainee’s standpoint, it is usually more important for the detainee to find a favorable defense expert than it is to go to trial within thirty days. Finding such a defense oriented expert can be problematic and a lengthy tedious process. Defense counsel may have to hire serially as many as six doctors before he finds one who can testify favorably for his client. Many of the doctors are from out of town or state. The limited number of defense oriented doctors are very busy and difficult to schedule for evaluations and trial. This process can literally take years. There are other avenues to secure release the defense can pursue as well, such as the self-commitment contract. ... Again, a difficult and lengthy process.
Findings of Fact at 36-38 (footnote omitted).
Although Morel has made no effort to show that the circuit court’s factual findings on this issue lack record support, our review of the record reveals that these findings are supported by competent, substantial evidence. It is clear that Morel agreed to an indefinite waiver of the statutory trial period for strategic reasons, that he has never objected to his continued confinement on this basis, and that the State has at all times been prepared and ready for trial. In fact, Morel’s attorney conceded that Morel has been active in trying to secure treatment without trial due to the stigma associated with commitment.[11] Instead of challenging the circuit court’s factual findings, Morel advances a legal argument and asserts that the “system’s failure to ensure [him] a prompt *242 resolution of his case violated his due process rights.” Morel contends that a detainee’s initial waiver of the thirty-day statutory period should not permit detention to continue indefinitely without a trial and that his civil detention of more than eight years is presumptively prejudicial.
From a legal standpoint, this Court has observed that “[t]he power to detain an individual for involuntary commitment is subject to certain well-defined constitutional limitations.” Mitchell, 911 So.2d at 1216 (quotation omitted). This principle is hardly controversial and flows logically from the premise that civil commitment proceedings initiated pursuant to the Act “involve a serious deprivation of liberty and, thus, such proceedings must comply with the due process clauses of the Florida and United States Constitutions.” State v. Goode, 830 So.2d 817, 825-26 (Fla.2002) (citing Addington, 441 U.S. at 425, 99 S.Ct. 1804 (holding that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection)).
This Court has recognized that in passing the Act the Legislature apparently contemplated that civil commitment proceedings would be “conducted well before a sexual offender’s prison sentence expires, so as to minimize the risk of ... indefinite detentions without a trial.” Goode, 830 So.2d at 830; see also Osborne v. State, 907 So.2d 505, 509 (Fla.2005) (emphasizing the Legislature’s dual concern that “a respondent not be indefinitely detained and that the State act promptly in bringing the matter to trial so that the respondent’s detention after the criminal sentence expires be kept to a minimum”). Concerns over an individual’s right to due process prompted the drafters of the Act to include section 394.916(1), which requires that a trial to determine whether a person is a sexually violent predator be conducted within thirty days of the probable cause determination. See § 394.916(1), Fla. Stat. With its inclusion of this provision, the Legislature sought to “temper the drastic effects of the indefinite detention scheme by the imposition of rigid time constraints set out in explicit language.” Goode, 830 So.2d at 822.
Interpreting section 394.916(1) in the context of both its express language and the right to due process, this Court has affirmed that the Act’s thirty-day deadline is mandatory, although not jurisdictional. See id. at 830; State v. Kinder, 830 So.2d 832, 833-34 (Fla.2002). Moreover, we have routinely emphasized that “there should be ‘scrupulous compliance’ with the statutory thirty-day time limit set forth in section 394.916(1).” Goode, 830 So.2d at 826; see also Kephart v. Hadi, 932 So.2d 1086, 1092-93 (Fla.2006) (examining the Ryce Act’s “numerous safeguards to ensure that a prisoner’s due process rights are protected” and explaining that “[t]he confinement of an individual past the expiration of his or her incarcerative sentence requires ‘scrupulous compliance’ with the Act’s requirements”).
Indeed, it was our concern over the significant and substantial liberty interests involved with involuntary and indefinite detentions that led this Court in Goode to observe that
[ijndefinite commitments under the Ryce Act clearly do not present situations where compliance is a matter of convenience or inconsequential matters are at issue. To the contrary, under the Ryce Act, detainees could literally be committed indefinitely for the rest of their lives. The U.S. Supreme Court has stated that even in civil commitments “[fjreedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.” *243 Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). “It is clear that ‘commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.’ ” Jones v. United States, 463 U.S. 354, 361, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (quoting Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). Obviously these commitments involve serious substantive rights with constitutional implications.
Goode, 830 So.2d at 825. While acknowledging the Legislature’s intent that the review process of potential sexual predators would end while the person was still in prison, the Court commented upon evidence that “in practice this [was] not occurring and that often people are being detained for long periods after their scheduled release date without being taken to trial.” Id. at 825 & n. 7; see also Murray, 872 So.2d at 222 (noting that lengthy pretrial detentions “are apparently not uncommon in civil commitment proceedings under the Act”). In Kinder, which was released the same day as Goode, this Court further observed that indefinite detentions under the Act were directly contrary to fundamental principles of due process:
In Goode we concluded that the Legislature did not intend the thirty-day time period explicitly set out in the statute to be merely a “suggested” practice, particularly when, as illustrated by this case, failure to comply with the time limit may mean a person can be detained for months or years on end without trial based on an ex parte proceeding. This Court can think of no other context, civil or criminal, that would allow an individual to be detained indefinitely based on a probable cause determination where the individual had no right to appear. Such a practice is directly contrary to fundamental principles of due process set out in our federal and state constitutions.
830 So.2d at 833-34.
After deciding Goode and Kinder, this Court in Osborne, 907 So.2d at 509, concluded that where a Jimmy Ryce respondent has completed his criminal sentence and is being detained awaiting trial, and the trial period has exceeded the statutory thirty-day period without a continuance for good cause, the respondent’s remedy is release from detention and a dismissal without prejudice of the pending proceedings. The Osborne remedy does not apply in cases where the respondent either seeks and obtains the continuance or consents to the delay. See Boatman v. State, 77 So.3d 1242, 1249 (Fla.2011). Accordingly, pretrial delay under either scenario does not necessarily offend due process principles.
Before its revision in 2006, section 394.916(2) of the Act provided that “[t]he trial may be continued upon the request of either party and a showing of good cause, or by the court on its own motion in the interests of justice, when the person will not be substantially prejudiced.” When interpreting the interplay between section 394.916, subsections (1) and (2), the Second District in Curry v. State, 880 So.2d 751 (Fla. 2d DCA 2004), rejected the argument that the right to a commitment trial within thirty days under section 394.916(1) could not be waived and concluded that a waiver was “essentially equivalent to a request by the defendant for a continuance under section 394.916(2).” Id. at 754. The Second District acknowledged that a Jimmy Ryce respondent may often need more than thirty days to prepare a defense and could therefore benefit from the delay, but cautioned that an initial waiver should not allow detention to continue indefinitely without trial, reasoning that “an indefinite detention would violate principles of due *244 process.” Id. at 755 (citing Goode, 830 So.2d at 825-26). To comply with due process, the Curry court held that a Jimmy Ryce respondent “must have an opportunity to withdraw his waiver and renew the requirement that a trial be held within thirty days.” Id. (citing Fla. R.Crim. P. 3.191(b) (permitting a criminal defendant to demand a trial within sixty days); Atkins v. State, 785 So.2d 1219, 1220 (Fla. 4th DCA 2001) (“Once a waiver of speedy trial rights has occurred, a defendant may ‘start the clock running again’ by invoking a demand for speedy trial.”)).[12]
Two years after the Second District decided Curry, the Legislature imposed an outer limit on the length of continuances a trial court could grant, amending section 394.916(2) to read as follows (additions emphasized, deletions in strike-through):
(2) The trial may be continued once upon the request of either party for not more than 120 days upon and a showing of good cause, or by the court on its own motion in the interests of justice, when the person will not be substantially prejudiced. No additional continuances may be granted unless the court finds that a manifest injustice would otherwise occur.
Ch.2006-33, § 1, Laws of Fla. This new provision went into effect on July 1, 2006. Id. § 3. On July 9, 2009, this Court adopted the Jimmy Ryce Rules of Procedure—a comprehensive set of rules to be used specifically in Jimmy Ryce proceedings that are consistent with and complementary to the legislative scheme. See In re Fla. Rules of Civil Procedure for Involuntary Commitment of Sexually Violent Predators, 13 So.3d 1025 (Fla.2009). In contrast to the provisions of the Act, the Jimmy Ryce Rules of Procedure expressly refer to a respondent’s waiver of the thirty-day time limit.
Section (a) of rule 4.240, which is entitled “Trial Proceedings After Finding of Probable Cause; 5 Day Status Hearing; Determination of Counsel for the Respondent; Waiver of Time Limitations,” authorizes a Jimmy Ryce respondent to waive the thirty-day statutory period and provides in pertinent part:
The trial to determine if the respondent is a sexually violent predator shall be commenced within 30 days after the summons has been returned served and filed with the clerk of the court, unless the respondent waives the 30 day time period in writing, with a copy to the assigned judge, or on the record in open court. The court shall set a trial date not less than 90 days after the date of the waiver of the 30 day period. Further continuances shall be allowed only on good cause shown. A future trial date shall be set if a further continuance is allowed.
(Emphasis added.) Rule 4.260, which is entitled “Continuance of Trial,” tracks the language of section 394.916(2), Florida Statutes (2011), and provides in full:
A motion for continuance by either party shall be in writing unless made in a hearing in open court and shall be signed by the party or attorney requesting the continuance. The motion shall *245 state all of the facts that the movant contends entitles [sic] the movant to a continuance. If a continuance is sought on the ground of non-availability of a witness, the motion must show when the witness will be available. The trial may be continued once upon the request of either party for not more than 120 days upon a showing of good cause, or by the court on its own motion in the interests of justice, when the person will not be substantially prejudiced. No additional continuances may be granted unless the court finds that a manifest injustice would otherwise occur. Continuances should only be ordered upon a showing of good cause. A motion for continuance on behalf of the respondent shall state that the respondent has been advised of all consequences of the request and of any rights waived by the motion.
(Emphasis added.)
A reading of rule 4.240, which discusses the parameters of waivers and refers to continuances, together with rule 4.260, which discusses the exact parameters of continuances, demonstrates that consistent with the Second District’s reasoning in Curry, waivers should not be open-ended or result in indefinite detentions. Under rule 4.240, a waiver acts as a triggering event for setting the case for trial. Once a waiver is entered, this prompts the court to set a trial date not less than ninety days from the date the waiver was executed. If either party seeks a continuance of the trial date as originally set, and good cause is shown, rule 4.260, which follows the language of section 394.916(2), prohibits the trial court from extending that trial date beyond 120 days. If either party seeks a further continuance beyond a 120-day extension, the trial court may not grant the motion unless the court finds that a manifest injustice would otherwise occur.[13]
Our plain-reading construction of rules 4.240 and 4.260 minimizes the risk of any potential due process violation related to open-ended waivers and indefinite pretrial delay and detention, even where a respondent consents to the delay. We note that the Second District’s conclusion in Curry that a Jimmy Ryce respondent may recapture his right to a trial within thirty days after entering a waiver, as defendants are permitted to do in the criminal, speedy-trial context, was based on an interpretation of Florida law as it existed before the Jimmy Ryce Rules of Procedure went into effect. However, neither the Act nor the Jimmy Ryce Rules of Procedure provide a respondent with a right to recapture the thirty-day time period once a waiver has been entered. Instead, when read together, these provisions authorize close-ended waivers, contemplate that a trial date be set at the time a waiver is entered, and set forth an outer time limit in which to set a trial if any further continuances of that trial date are permitted.
We recognize that Morel’s case falls into an unusual category, in that he executed a waiver of the thirty-day time limit in April 2002 — almost four years before the Legislature’s revision to section 394.916(2) and almost seven years before the Jimmy Ryce Rules of Procedure went into effect. Therefore, the event triggering the circuit court’s obligation to set a trial date under the new rules — Morel’s waiver — occurred years before they went into effect. At the time Morel entered his waiver, the trial *246 court was not required to set this case for trial. The question, then, is whether due process still entitles Morel to relief.
Morel analogizes his challenge to a criminal, speedy-trial claim and asserts that the delay in bringing him to trial is so extraordinary that prejudice is presumed, citing to Doggett v. United States, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), and United States v. Mohawk, 20 F.3d 1480 (9th Cir.1994). Assuming case law on a defendant’s right to a speedy criminal process provides an appropriate framework in which to analyze this claim, we conclude that Morel is not entitled to relief.
The term “presumptively prejudicial,” as used by the United States Supreme Court in Doggett, simply marks the point at which courts may deem delay unreasonable enough to trigger a further inquiry pursuant to Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). See Doggett, 505 U.S. at 651-52, 112 S.Ct. 2686. In Doggett, the Supreme Court cited to Barker for the proposition that when evaluating whether a Sixth Amendment speedy trial violation has occurred, a court must make four separate inquiries, which must be weighed and balanced: (1) whether the delay was uncommonly long; (2) whether the State or the defendant was more to blame for the delay; (3) whether the defendant properly asserted his right to a speedy trial; and (4) whether the defendant suffered prejudice as a result of the delay. Id. at 650, 112 S.Ct. 2686. Until the delay is determined to be presumptively prejudicial, however, there is no necessity for an inquiry into the other Barker factors. Id. at 652 n. 1, 112 S.Ct. 2686.
The Supreme Court in Doggett concluded that the eight-and-a-half-year delay between the defendant’s indictment and arrest was sufficiently long to trigger a Barker inquiry as presumptively prejudicial. Although the defendant could not point to any specific prejudice he incurred as a result of the delay, the Court held that the defendant was nevertheless entitled to relief because the government’s own negligence caused a “delay six times as long as that generally sufficient to trigger judicial review.” Id. at 658, 112 S.Ct. 2686. In Mohawk, the United States Court of Appeals for the Ninth Circuit actually rejected the argument that Dog-gett’s reasoning applied to a claim predicated upon a ten-year appellate delay after the defendant’s original trial was completed. 20 F.3d at 1488. Although the delay in Mohawk, as in Doggett, was attributable solely to the government, the Ninth Circuit concluded that an appellant must show actual trial prejudice in the event of a second prosecution in order to win outright dismissal of his indictment on the grounds of appellate delay. Id. at 1485, 1488.
In the present case, the now nearly ten-year pretrial delay Morel experienced creates a presumption of prejudice triggering an inquiry pursuant to Barker. However, a consideration of whether the State or Morel was more to blame for the delay and whether Morel properly asserted his right to a speedy trial weighs heavily against him. See King v. DeMorales, CV 08-4984-TJH (JEM), 2010 WL 4916624, at *18 (C.D.Cal. May 3, 2010) (attributing the three-year delay in holding civil commitment hearing to the numerous motions the defendant filed while representing himself, including motions pertaining to his conditions of confinement and several motions to disqualify); Coleman v. Mayberg, No. C 01-3428 SBA(PR), 2005 WL 1876061, at *8 (N.D.Cal. Aug. 8, 2005) (attributing five-year delay in sexually violent predator civil commitment trial to defendant because he neither asserted his right to a speedy trial nor objected to any continuances). During relinquishment, Morel himself acknowl *247 edged that at no point did he ever demand a reinstatement of his right to have a timely trial and that his goal has always been to receive treatment without a trial.
As to prejudice, the Supreme Court in Barker recognized three common forms of arguable prejudice: “oppressive pretrial incarceration,” “anxiety and concern of the accused,” and “the possibility that the [accused’s] defense will be impaired” by dimming memories and loss of exculpatory evidence, the last of which the Court described as the “most serious” because “the inability of a defendant adequately to prepare his case skews the fairness of the entire system.” Barker, 407 U.S. at 532, 92 S.Ct. 2182; see also Doggett, 505 U.S. at 654, 112 S.Ct. 2686. Morel does not discuss these forms of prejudice; instead, indefinite detention without treatment is the primary prejudice he claims to have endured. However, we have already rejected his argument that the treatment offered to noncommitted detainees is inadequate.
We do recognize that the length of pretrial confinement in this case based on nothing more than an ex parte probable cause determination pushes the outer bounds of due process and could be construed as oppressive, but this recognition “must be balanced and assessed in light of the other Barker factors, including the reasons and responsibility for the delay.” Coleman, 2005 WL 1876061, at *10. We therefore conclude that on balance, the fact that Morel sought to purposefully delay his trial defeats his claim for relief. See, e.g., King, 2010 WL 4916624, at *18 (“[Although Petitioner describes the conditions of his confinement as harsh, this factor (as well as any anxiety and concern he suffered) must be assessed in light of his own responsibility for the delay.”); Page v. Lockyer, 200 Fed.Appx. 727, 728 (9th Cir.2006) (concluding that even if a six-year period of pretrial detention were sufficient to satisfy the element of oppression, petitioner was not entitled to relief because he caused the delay and failed to meaningfully assert his right to receive a speedy trial); Coleman, 2005 WL 1876061, at *10 (finding that the petitioner’s five-year detention during sexually violent predator proceedings did not meet the Barker prejudice prong when petitioner was responsible for the delay).
Unlike the government-induced delay in both Doggett and Mohawk, here, Morel acquiesced to the indefinite postponement of trial and never once sought to recapture his right to be brought to trial in a timely manner. Morel could have, at any time, ended the delay and avoided any prejudice caused by the passage of time. He should not be permitted to take advantage of the protracted delay he had a large hand in creating. Accordingly, we affirm the denial of relief on this claim.
III. CONCLUSION
In short, we agree with the circuit court’s well-reasoned conclusion in this case that “Morel holds the key to his cell. He can go to trial (whenever he wants), prevail and be released or, if he is committed after trial, he is entitled to continue with his sex offender treatment with a view toward reaching ‘maximum therapeutic benefit.’” The circuit court properly determined that “for tactical reasons, Morel has delayed his trial for years” and that his “commitment trial should proceed [since] all reasonable avenues have been explored by the defense.” Accordingly, we affirm the judgment of the Twelfth Judicial Circuit Court denying Morel’s emergency petition for a writ of habeas corpus, but refer the matter of ensuring compliance with the requirements of both the Act *248 and the Jimmy Ryce Rules of Procedure to the appropriate rules committees.
It is so ordered.
PARIENTE, QUINCE, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., specially concurs -with an opinion, in which PERRY, J., concurs.
CANADY, C.J., LEWIS, and POLSTON, JJ., concur in result.

. Morel contemporaneously filed in this Court a motion requesting a stay of his civil commitment trial that was to commence in the Seventeenth Judicial Circuit Court. In our order of relinquishment, we granted Morel relief in part by temporarily staying the civil commitment trial pending the resolution of fact-finding that was to be conducted during the relinquishment period. See Morel, 59 So.3d at 1083. After the relinquishment period ended, we lifted the temporary stay and ordered Morel’s civil commitment proceedings to move forward immediately without any further delay. See Morel v. Satz, No. SC11-105 (Fla. Sup.Ct. order filed Dec. 14, 2011).

. Morel was convicted of two counts of sexual battery pursuant to section 794.011(5), Florida Statutes (1993), which criminalizes the "sexual battery upon a person 12 years of age or older, without that person’s consent, [when] in the process thereof [the offender] does not use physical force and violence likely to cause serious personal injury.” Morel was also convicted of kidnapping.

. Since 2006, GEO has managed and operated the FCCC and its sex offender treatment programs. Pursuant to section 394.9151, Florida Statutes (2011), DCF "may contract with a private entity or state agency for use of and operation of facilities to comply with the requirements” of the Act. In 2006, DCF replaced Liberty Behavioral Healthcare Corporation (Liberty) as the FCCC’s operator, and on July 1, 2006, DCF awarded the contract to GEO.

. The following nine witnesses testified: (1) Jeanine Cohen (Morel’s civil commitment attorney from 2005 to present); (2) Rob Jako-vich (an assistant public defender who represents defendants in Jimmy Ryce proceedings); (3) Kristin Kanner (the assistant state attorney who has handled Morel's case since December 2004); (4) Dr. Amy Swann (a forensic psychologist who works at the FCCC and has spoken to Morel); (5) Barbara Brown (an employee in the Broward County clerk's office who explained the docket sheet); (6) Dr. Suzonne Kline (the Director of the Sexually Violent Predator Program for DCF); (7) Timothy Budz (the Facility Administrator for GEO at the FCCC); (8) Dr. Robin Wilson (the Clinical Director at the FCCC); and (9) Ronald Morel himself. Morel also introduced into evidence a composite exhibit of 170 surveys from residents of the FCCC who described waiting periods they encountered before entering into treatment programs; the State filed a rebuttal declaration authored by Keri Fitzpatrick, a recreational therapist at the FCCC.

. Morel explains the factual basis for the delay as a separate issue, but he does not set forth a claim for relief with respect to that issue.

. In 2006, the Legislature revised section 394.916(2) to impose an outer time limit on the length of continuances a trial court could grant. See ch.2006-33, § 1, Laws of Fla. The significance of the Legislature's revisions is discussed in more detail below.

. Morel does not argue that his conditions of confinement while awaiting trial are punitive in nature. Cf. Jones v. Blanas, 393 F.3d 918, 932 (9th Cir.2004) ("At a bare minimum, then, an individual detained under civil process — like an individual accused but not convicted of a crime—cannot be subjected to conditions that 'amount to punishment.' ” (quoting Bell v. Wolfish, 441 U.S. 520, 537, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979))); In re Commitment of Finfrock, 28 So.3d 983, 983 (Fla. 2d DCA 2010) (concluding that an individual detained at the FCCC while awaiting his Jimmy Ryce trial presented a legally sufficient habeas claim where he alleged that his placement in restrictive confinement amounted to punishment and violated his constitutional rights).

. In Johnson, the Supreme Court of Kansas surveyed the different approaches courts have taken when evaluating the constitutionality of state civil commitment treatment programs, noting that the issue has been the subject of debate by legal analysts and listing the following examples:
Allison v. Snyder, 332 F.3d 1076, 1081 (7th Cir.2003) (applying Youngberg and holding (1) committed individuals are entitled to some treatment, and (2) what that treatment entails must be decided by mental health professionals); Sharp v. Weston, 233 F.3d 1166, 1172 (9th Cir.2000) (holding that due process requires that civilly committed persons be provided "a realistic opportunity to be cured or improve the mental condition for which they were confined”); Ohlinger v. Watson, 652 F.2d 775, 777-78 (9th Cir.1980) (stating civilly committed persons are entitled to mental health treatment that gives them a realistic opportunity to be cured and released; standard is one only required to provide a "reasonable level of treatment based upon a reasonable cost and time basis”); Cross v. Harris, 418 F.2d 1095, 1107 (D.C.Cir.1969) (due process commands that conditions and duration of confinement bear some reasonable relation to its civil purpose—treatment—without which incapacitation serves as mere preventive detention, “a warehousing operation for social misfits”).
Johnson, 215 P.3d at 584. Although the trial court in Johnson applied a standard of whether the treatment fell within the range of treatment recognized by reasonable professionals, as contemplated by the Supreme Court in Youngberg, the Supreme Court of Kansas never decided the issue because of the petitioners' noncompliance. Id.

. Other courts, including the United States District Court for the Middle District of Florida in the Canupp federal class-action case that specifically addressed the treatment offered at the FCCC, have applied the Young-berg standard when confronted with similar claims. See Canupp, 2009 WL 4042928, at *10-11 (relying on Youngberg for the proposition that "persons involuntarily in institutions have a substantive due process right to minimally adequate treatment,” but noting that Youngberg only provides for "minimal constitutional standards” and that the Constitution does not require "optimal treatment”); see also Snyder, 332 F.3d at 1081 ("The defendants’ contention that Illinois is using programs that represent the application of reputable professional judgment [under Youngberg ] stands without any serious contest.”); Burch v. Jordan, No. 07-3236, 2010 WL 5391569, at *14-17 (D.Kan. Dec. 22, 2010) (applying the Youngberg standard to a claim challenging the state's treatment program following petitioner’s commitment), aff'd, 444 Fed.Appx. 236 (10th Cir.2011); Hargett v. Adams, No. 02-C-1456, 2005 WL 399300, at *19-20 (N.D.Ill. Jan. 14, 2005) (applying Youngberg to claims of inadequate treatment); Laxton v. Watters, 348 F.Supp.2d *238 1024, 1028 (W.D.Wis.2004) (applying Young-berg standard to constitutional challenge to sexually violent predator treatment offered).

N. 15.] Financial considerations were an important factor when Liberty closed the SOTP to detainees. This is no longer a factor or basis for precluding detainees from Phases II-IV.

N. 16.] The Legislature considered this dilemma in March 2006 and chose not to change the statute to preclude statements made by detainees (or those already committed) during treatment.

. Based on the testimony presented, the circuit court defined a self-commitment contract in the following manner:
A self-commitment contract is a mechanism employed by the State Attorney and the detainee to bypass a commitment trial. The detainee agrees to be "committed.” As a result, he will receive sex offender specific treatment at FCCC with a view toward release after agreed upon criteria are met. The contract usually contains conditions of release to insure the community is protected. The conditions are often similar to those of sex offender probation. The terms of the agreement vary depending primarily upon the background of the detainee. These multifaceted agreements, signed by the State and the detainee, must be approved by the circuit court that entered the probable cause finding.
*241 Findings of Fact at 6 n. 4. The Act does not expressly reference self-commitment contracts.

. For example, Morel’s attorney emphasized that once committed, Jimmy Ryce respondents must register as sexual predators — a designation placed upon the respondent for the rest of his or her life.

. Several other Florida courts have reached conclusions similar to the Second District in Curry. See, e.g., Kolin v. State, 927 So.2d 198, 200 (Fla. 5th DCA 2006) (concluding that the thirty-day deadline may be waived and that "section 394.916(2) of the Act provides for waiver of the deadline upon the trial court’s granting of a well-founded motion to continue”); Williams v. State, 870 So.2d 922, 923 (Fla. 3d DCA 2004) (rejecting respondent’s argument that he should be released from custody because he was not brought to trial within thirty days of the trial court's probable-cause finding because respondent explicitly waived the thirty-day trial requirement in order to work on his defense).

. During a February 3, 2011, status hearing before the Seventeenth Judicial Circuit Court to address the Jimmy Ryce cases currently pending in that circuit, the court agreed with this interpretation of the rules. At this hearing, the parties discussed whether the continuing need to find a psychologist to support the defense’s position at trial would present a valid basis for finding manifest injustice, but we do not reach that issue here.